CACTUS CORNER, LLC, a California Limited Liability Corporation; Venida Packing Company, a California Corporation; California Citrus Mutual; and California Grape and Tree Fruit League, Plaintiffs,

v.

U.S. DEPARTMENT OF AGRICULTURE; Ann V. Veneman, Secretary of Agriculture; and Bobby R. Acord, Administrator, Animal and Plant Health Inspection Service, Defendants,

InterCitrus, a Spanish Trade Association; Ibertrade Commercial Corporation, a New York Corporation; LGS Special Sales, Ltd., a New York "S" Corporation; and Luke G. Sears, President of Lgs Special Sales, Ltd., Intervenor–Defendants.

No. CIV–F–02–6270 OWW SM.

United States District Court,
E.D. California.

March 11, 2004.

Neil J King, Wilmer Cutler Pickering LLP, Washington, DC, Jan L Kahn, Kahn Soares and Conway, Hanford, CA, for Cactus Corner LLC.

Jan L Kahn, Kahn Soares and Conway, Hanford, CA, for Venida Packing Co., California Citrus Mutual, California Grape and Tree Fruit League.

Linda Anderson, United States Attorney's Office, Fresno, CA, Daniel Bensing, United States Department of Justice, Civil Division, Washington, DC, for U.S. Dept. of Agriculture.

Brian C Leighton, Law Offices of Brian Leighton, Clovis, CA, for InterCitrus, Ibertrade Commercial Corp., LGS Specialty Sales Ltd.

David A Holzworth, Lepon Holzworth and Kato PLLC, Washington, DC.

MEMORANDUM DECISION AND ORDER RE: (1) PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; (2) FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; (3) FEDERAL DEFENDANTS' REQUEST FOR JUDICIAL NOTICE; and (4) INTERVENOR-DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

(DOCS. 23, 31, 34, and 39)

WANGER, District Judge.

## I. INTRODUCTION

Cactus Corner, LLC, Venida Packing Company, California Citrus Mutual, and the California Grape and Tree Fruit League ("Plaintiffs") sue the United States Department of Agriculture, Secretary of Agriculture Ann M. Veneman, and Bobby R. Acord, the Administrator of the Department of Agriculture's Animal and Plant Health Inspection Service ("Defendants" or "Federal Defendants") seeking judicial review of a final rule entitled "Importation of Clementines from Spain" (the "Rule") promulgated in 67 Fed.Reg. 64702 (October 21, 2002), effective October 15, 2002. *See* Doc. 1, Complaint for Declaratory and Injunctive Relief ("Complaint") at ¶¶ 1, 4–10. Plaintiffs advance four claims, that the Rule is: (1) inconsistent with and in excess of Defendants' statutory authority under the Plant Protection Act, 7 U.S.C. §§ 7701 *et seq.*, as provided in section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C); (2) "arbitrary, capricious, an

abuse of discretion, and otherwise not in accordance with law" as provided in section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); (3) violative of the Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq.*, and fails to observe procedure required by law, namely the preparation of an initial or final regulatory flexibility analysis for the Rule required by the Regulatory Flexibility Act (RFA), the decisional standards required under the PPA, and (4) violative of section 102 of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. *See id.* at 10. Plaintiffs seek declaratory and injunctive relief to set aside and hold the Rule unlawful, to enjoin Defendants from implementing it or otherwise allowing the importation of clementines from Spain. *See id.* at 10. Plaintiffs also seek an award of costs, disbursements, and reasonable attorneys' fees. *See id.*

On November 12, 2002, InterCitrus, Ibertrade Commercial Corporation, LGS Specialty Sales, Ltd., and Luke G. Sears (Intervenor Defendants) moved under Fed.R.Civ.P. 24(a)(2) to intervene in the case as a matter of right. *See* Doc. 6. On December 20, 2002, the motion to intervene was granted. *See* Doc. 11, filed Jan. 7, 2003.

Plaintiffs move for summary judgment. *See* Doc. 23, filed Mar. 24, 2003, and Doc. 24. Federal Defendants filed a cross-motion and supporting memorandum for summary judgment.[1] *See* Doc. 31, filed Apr. 25, 2003, and Doc. 32. Intervenor–Defendants filed opposition. *See* Doc. 30 filed Apr. 22, 2003. Plaintiffs filed opposition to Federal Defendants' motion and a re-sponse to Intervenor–Defendants' opposition to Plaintiffs' motion. *See* Doc. 38 filed May 27, 2003. Federal Defendants filed a response to Plaintiffs' opposition. *See* Doc. 43 filed Jun. 19, 2003.

Pursuant to Fed.R.Evid. 201, Federal Defendants request the Court take judicial notice of a report entitled "Spanish Clementine Data Report and Analysis," published on the website of the United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS"). *See* Doc. 34, filed Apr. 28, 2003. Intervenor–Defendants request the Court take judicial notice of a letter entitled "Clementine Stakeholder Letter," authored by the Department of Agriculture and published on its website. *See* Doc. 39, filed Jun. 10, 2003. Plaintiffs objected to both requests. *See* Doc. 35 filed May 1, 2003, and Doc. 40, filed Jun. 16, 2003. Intervenor–Defendants filed a supporting memorandum. *See* Doc. 36, filed May 8, 2003.

### A. *Jurisdiction.*

Jurisdiction over the parties exists under 28 U.S.C. § 1331 and authority to grant the declaratory and injunctive relief sought by Plaintiffs is provided under 28 U.S.C. § 2201 and 5 U.S.C. §§ 705 and 706. Oral argument was heard on January 8, 2004.

### II. *BACKGROUND*

### A. *Undisputed Material Facts*

On March 24, 2003, the parties submitted a statement of stipulated facts pursuant to Local Rule 56–260(c).[2] *See* Doc. 25.

---

**1.** Plaintiffs' motion for summary judgment was defective for failure to attach a signed proof of service. *See* Doc. 23. Plaintiffs have filed separate proofs of service for their summary judgment motion. *See* Doc. 28, filed Apr. 3, 2003; *see* Doc. 29, Proof of Service for

Motion for Summary Judgment on AUSA Catherine on March 26, 2003, filed Apr. 3, 2003.

**2.** The submitted document was found deficient for failure to attach a signed proof of

The parties agree that "this action for judicial review of an agency rule can be decided by the Court on the basis of the Motion, Opposition thereto and Cross–Motions for Summary Judgment, the responsive pleadings, the stipulated facts set forth below, and the Administrative Record filed by the Federal Defendants-on the understanding that, to do so, the Court will have to examine the portions of the Administrative Record (AR) cited by the parties." [3] *See id.* at 1–2:28–5. The parties further stipulated that "[b]ecause this case involves judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2), the Court's decision on the cross-motions for summary judgment does not involve an inquiry into whether there are any genuine issues of material fact." Doc. 25 at 2:5–7 (citing *Northwest Motorcycle Association v. United States Department of Agriculture*, 18 F.3d 1468, 1472 (9th Cir.1994); *Environment Now! v. Espy*, 877 F.Supp. 1397, 1421 (E.D.Cal.1994)).

The parties agree the following are undisputed material facts:

1. On December 5, 2001, following reports of live Mediterranean fruit fly ("Medfly") larvae being found in Spanish clementines purchased at retail outlets in a number of states, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") suspended imports of clementines from Spain indefinitely and initiated an investigation. (Doc. 25 at 2:10–13).

2. On July 11, 2002, APHIS published a proposed rule that would authorize a resumption of Spanish clementine imports on specific conditions. 67 Fed. Reg. 45922. APHIS held two public hearings and accepted comments on the proposal until September 9, 2002. (*See id.* at 2:14–16).

3. On October 15, 2002, APHIS promulgated the final rule ("Rule") that is the subject of this action. The Rule, which was published in the Federal Register on October 21, 2002, 67 Fed.Reg. 64702, allows the importation of clementines grown in regions of Spain where Medfly is found—as long as certain conditions specified in the Rule are met. (*See id.* at 2:17–20).

4. APHIS did not prepare an initial or final regulatory flexibility analysis for the Rule, because it determined that the Rule will not have a significant economic impact on a substantial number of small entities. That determination was based on a Regulatory Impact Analysis dated October 15, 2002.

5. The relevant facts for purposes of judicial review are contained in the Administrative Record that APHIS filed with the Court on February 13, 2003. The parties hold differing views as to the meaning, significance, and implications of these facts and will express those views, with appropriate references

---

service form. *See* Doc. 25. On April 3, 2003, Plaintiffs submitted a proof of service of the statement of stipulated facts on AUSA Catherine Cerna on March 24, 2003. *See* Doc. 27. While no proof of service document exists for Intervenor–Defendants, the statement of stipulated facts was signed by Brian C. Leighton, Esq., attorney for Intervenor–Defendants. *See* Doc. 25.

Local Rule 56–260(c) states: "All interested parties may jointly file a stipulation setting forth a statement of stipulated facts to which all interested parties agree. As to any stipulated facts, the parties so stipulating may state that their stipulations are entered into only for the purposes of the motion for summary judgment and are not intended to be otherwise binding."

3. This document does not conform to Local Rule 7–130's requirement that *"[e]*ach page shall be numbered consecutively at the bottom." *See* Local Rule 7–130. The court is not limited to the parties' citations of the AR.

to the Administrative Record, in their respective pleadings. (*See id.* at 2:25–28).

## B. *Factual Background*

### i. *Events Leading up to the Import Suspension of Spanish Clementines in 2001*

Clementines (several varieties of *Citrus reticulata*) from Spain have been imported into the United States for over fifteen years. *See* A.R. 1230. ("The U.S. Department of Agriculture (USDA) has allowed the importation of clementines from Spain since 1985." A.R. 1130). Prior to the import ban of 2001, Federal Defendants allowed the importation of Spanish clementines under a regimen of cold treatment that was designed to prevent the risk of the Mediterranean Fruit Fly ("Medfly") using the imported citrus as a pathway into the United States. *See* A.R. 1130, 1238.

The pre-ban cold treatment regimen was specified in the Plant Protection and Quarantine Manual (7 C.F.R. § 300.1), which required fruit to be held at the following temperatures:

| Temperature | Exposure Period (Days) |
| --- | --- |
| 32°F or below | 10 |
| 33°F or below | 11 |
| 34°F or below | 12 |
| 35°F or below | 13 |
| 36°F or below | 14 |

Pursuant to 7 C.F.R. § 319.56–2(e), Federal Defendants allowed the import of Spanish clementines under permit, subject to inspection at the port of entry to ensure the implementation of cold treatment measures. *See* A.R. 1130; *see also,* Statement of Dr. Inder P.S. Gadh ("Gadh"), APHIS Officer, A.R. 1054 (Inspection at the port of entry was "to verify the cold treatment documents, to take pulp temperatures, and also to do some spot checking for other pest other than the fruit fly.") "Prior to November and December 2001, there had never been multiple confirmed finds of Medflies in fruit of any kind that had been legally imported into the mainland United States from any source." *See* A.R. 1130. According to Dr. Gadh, the cold treatment regimen "worked very well since its inception in 1985 other than sporadic incidents of some shipments not making cold treatment or some suspicious looking fruit flies being reported as live but turned out to be dead, when checked." *See* Gadh, A.R. 1054. Throughout the history of importation of clementines from Spain, "there was no [sic] major incidents to thwart or to raise alarms," until late 2001. *See* A.R. at 1054.

Between late November and December 2001, APHIS began receiving reports of live Medfly larvae in clementines from Spain. *See* Doc. 19, Notice of Filing, A.R. 1282, 67 Fed.Reg. 64702, filed Feb. 25, 2003.[4] A list of live Medfly larvae finds discovered in clementines imported from Spain includes:

(1) On November 20, 2001, live Medfly larvae were found in Avon, North Carolina by a consumer, who was also a North Carolina Department of Agriculture official.[5] *See* A.R. 87, Richard L. Dunkle Letter to the Honorable Luis M. Esterue-

---

**4.** The administrative record ("A.R.") filed by Federal Defendants on February 14, 2003 omitted the first page of the A.R. containing the Final Rule authorizing the re-importation of Spanish Clementines into the United States. *See* Doc. 19.

**5.** The larvae detected in Avon, North Carolina, was found in "Nadel" brand Spanish clementines and was purchased for personal consumption on November 17, 2001. *See* A.R. 87.

las, dated Jan. 4, 2002. A North Carolina State Agriculture Inspector was able to collect 4–5 live pupae[6] from the infested clementine. *See id.* at 121, Letter to Noboru Saito, dated Dec. 19, 2001. The fruit in which larvae were detected were traced back to a shipment aboard the "M/V Green Maloy" which arrived in Philadelphia on November 10, 2001. *See id.* at 87.

(2) On November 27, 2001, live larvae were found by an APHIS employee in Bowie, Maryland, and were confirmed to be alive by a Plant Protection & Quarantine ("PPQ") Identification staff specialist. *See id.* The infested fruit was traced back to the "M/V Green Maloy" and was also found in "Nadel" brand Spanish clementines. *See id.* at 88.

(3) On December 3, 2001, in Santa Clara County, California, live larvae were found in Spanish clementines by county agriculture officials. *See id.* Fourteen "third instar" larvae were detected, four or five of which were alive. *See* A.R. at 121. The infested fruits were identified as "Bagu" brand, *see id.* at 88, were not in their original boxes, and were re-labeled as "LOT 4450 CUTIES," a California brand. *See* A.R. at 121. The clementines were from Nob Hill Foods in San Jose, California, an urban supermarket not within close proximity to any citrus-producing areas. *See id.*

(4) On December 4, 2001, eight live larvae were found by APHIS and PPQ officers in Shreveport, Louisiana. *See id.* at 88; A.R. at 166, Clementine Oranges from Spain: Talking Points ("Talking Points"), dated Dec. 5, 2001. "The larvae were identified as Tephritidae, and the only Tephritid in Spain is Medfly." *See* Talking Points at 166. The infested fruit was traced back to a shipment which arrived on November 7, 2001 on the "M/V Japan Senator" in Newark, New Jersey. *See* A.R. at 88. The clementines were identified as "Evyan" brand and the "Japan Senator" contained four (4) containers of "Evyan" brand Spanish clementines: HJCU 6986080, HJCU 6010734, HJCU 6984683, and HJCU 6051271. *See id.*

(5) On December 6, 2001, live larvae were found in Riverside and San Diego Counties, in the State of California, by county agriculture officials. *See id.* The infested fruit was found in "Elite" and "Llusar" brand Spanish clementines. *See id.*

(6) On December 7, 2001, county agriculture officials in Riverside County, California, found live larvae in "Bagu" and "Llusar" brand Spanish clementines. *See id.*

In addition to live Medfly larvae found in Spanish clementines, APHIS inspectors "found hundreds of dead larvae [during] the 2001 shipping season." *See id.* at 115, APHIS Letter to Congressman Robert A. Borski, dated Apr. 22, 2002. The "unusually high number of dead Medfly [larvae] reported" is "indicative of an unusually high Medfly infestation in fruit coming from Spain this shipping season." *See id.* at 163, Richard L. Dunkle Letter to Dr. Raphael Milan ("Letter Suspending Spanish Clementine Imports"), dated Dec. 5, 2001. Following these finds, APHIS initiated fruit cutting measures at United States' ports of entry to ensure that appropriate cold treatment measures were in place. *See id.* at 126. On November 30, 2001, APHIS notified the Spanish Government that clementine imports were suspended pending completion of an investigation. *See id.* On December 4, 2001, APHIS notified the Government of Spain that clementine imports would resume on

---

6. "Pupae" are "insect[s] in the stage of development between the larval and adult forms."

Websters New World Dictionary, College Ed., 1966.

December 5th, after preliminary investigations indicated that the anomaly was limited to the "M/V Green Maloy." [7] *See id.* at 126; *see also,* A.R. 95–109, Cold Treatment Records for the M/V Green Maloy. The following day, APHIS notified the Spanish Government that "it was suspending the importation of clementines[,]" that "all shipments of clementines from Spain were refused entry into the United States," and "restrictions on the marketing of Spanish clementines that had already been released into domestic commerce" would take effect immediately. *See* A.R. 1282, Final Rule, 67 Fed.Reg. 64702.

ii. *The December 5, 2001 Import Suspension, the Dangers Associated with the Mediterranean Fruit Fly, and the Secretary of Agriculture's Authority under Section 7712(a) of the Plant Protection Act*

On December 5, 2001, based on the findings of live Medfly larvae in clementines imported from Spain, APHIS took the "emergency action of suspending the entry of Clementine citrus from Spain." *See* Letter Suspending Spanish Clementine Imports. The same day, APHIS wrote clementine Stakeholders, stating the danger of the possibility of Medfly introduction in the United States and the remedial measures taken:

The Medfly (Ceratitis capitata) is one of the world's most destructive agricultural pests, threatening more than 20 kinds of fruits, nuts, and vegetables. The female Medfly attacks ripening fruit, piercing the soft skin and laying eggs in the puncture. The eggs hatch into larvae, which feed inside the fruit pulp. The United States has no established Medfly populations, and USDA has taken the following steps to guard against further introduction:

● All imports of clementines from Spain are suspended until further notice.

● Clementines cannot be moved into the following States due to climatic conditions and host materials that are favorable to Medflies: Alabama, Arizona, Arkansas, California, Florida, Georgia, Louisiana, Mississippi, North Carolina, Nevada, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, Texas, and Washington. This prohibition includes Puerto Rico.

● Wholesalers and retailers may not sell or distribute clementines from Spain in the States listed above. The fruit must be removed from retail shelves and held for destruction in the States listed above or shipped to approved States.

● Destruction or movement of fruit should be with advance approval from State agriculture or local USDA Plant Protection and Quarantine (PPQ) officials. State and PPQ contacts may be found on the APHIS website at *www. aphis.usda.gov/ppq.*

● States that can receive Spanish clementines from prohibited States are as follows: Idaho, Iowa, Utah, Montana, Wyoming, West Virginia, Colorado, Kansas, Nebraska, South Dakota, North Dakota, Minnesota, Wisconsin, Illinois, Missouri, Indiana, Michigan, Ohio, Kentucky, Virginia, Pennsylvania, Maryland, Delaware, Hawaii, New Jersey, the District of Columbia, Rhode Island, Massachusetts, New York, New Hampshire, Ver-

7. It was later discovered that cold treatment records from the M/V Green Maloy had "met or surpassed the fruit temperature requirements of 33 degrees Fahrenheit/or 0.55 degrees Celsius/11 day schedule provided under the U.S. Code of Federal Regulations (C.F.R.) 319.56, treatment schedule T–107a." *See* A.R. 120.

mont,...Maine, Alaska, and Connecticut.

- Spanish clementines already in the United States will be authorized movement to Canada by USDA, PPQ officials on a case-by-case basis."

*See* A.R. at 164–65. At the same time, the Spanish Government dismissed the reports that live Medfly larvae were found in clementines imported from Spain, stating that "cold treatment eliminates any possibility whatsoever of the larvae... surviving[,]" and that, as a result, "the presence of live larvae in the Spanish clementines defies explanation." *See* A.R. at 173, Letter from Miguel Arias Cañete, Minister of Agriculture, Fisheries & Food of Spain to Ann M. Veneman, dated Dec. 5, 2001. On December 12, 2001, Mr. Luis M. Esteruelas, on behalf of the Spanish Ministry of Agriculture, requested that APHIS provide: (1) "evidence to date of all of the instances of larvae that has motivated USDA's decision to suspend the importation of Spanish clementines into the United States..."; and (2) the entomological analyses of the larvae discovered. *See* Esteruelas Letter to Bill Hawks, Under Secretary for Marketing and Regulatory Programs, USDA, dated Dec. 12, 2001, at A.R. 133. The Spanish Ministry of Agriculture offered their full cooperation, stressing that "finding a solution to this matter is of the utmost urgency for the Spanish government and especially for the Ministry of Agriculture." *See id.*

According to Dr. Gadh, APHIS' decision to suspend imports of clementines "was not taken well by Spain and...some importers here in the USA who decided to take the matter to the court." *See* Gadh, A.R. 1055. Dr. Gadh opined: "APHIS had to take that action. There was no choice. And we did what we had to do to safeguard our resources and also to protect markets at the time." *See id.* Interve-

nor–Defendants filed suit in the United States District Court for the Eastern District of Pennsylvania seeking declaratory and injunctive relief against the USDA/ APHIS' clementine import suspension. *See* Doc. 6 at 4:18–21. In a subsequent correspondence with APHIS, Intervenor–Defendants disputed the viability of the larvae discovered: "It is our understanding that the larvae were of dubious nature, especially those found in California. Inspectors stated that they were 'possible [sic] alive'. All were of 'brownish' color, not the typical cream color of live larvae, and with the exception of one, all were found in supermarkets, far from the 'point of entry.'" *See* A.R. at 205.

The decision to prohibit the importation of Spanish clementines, taken by the Secretary of Agriculture, was made pursuant to her authority under the Plant Protection Act ("PPA"), 7 U.S.C. §§ 7701 *et seq. See* Final Rule at 64702–03, A.R. 1282–83; *see* 7 U.S.C. § 7712(a). Under Section 7712(a) of the PPA, the Secretary of Agriculture is authorized to prohibit or restrict the importation or entry of any plant product "if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States...of a plant pest..." like the Medfly, which is not widely distributed within the United States. *See* 7 U.S.C. § 7712(a). The Secretary should exercise her authority to restrict or prohibit the entry of a plant product into the United States where its entry "could present an unacceptable risk of introducing or spreading plant pests." *See* 7 U.S.C. § 7701(7). This exercise of authority was taken after multiple live Medfly larvae finds in the United States because Medfly is "the hoof and mouth, or foot and mouth disease of the fresh food industry, probably of the entire plant industry. This is indeed the worst of the worst. It is an extremely plastic, dynamic, adaptable pest

worldwide, not just in the United States, one of the key pests of fruit production." *See* A.R. 1071, Statement of APHIS Official, Dr. Ron Sequeira ("Sequeira"), Public Hearing on Importation of Spanish Clementines, Oxnard, California, Aug. 20, 2002 ("Aug. 20, 2002 Hearing"). Dr. Sequeira opined that the possibility of the introduction of Medfly into citrus-producing areas of the United States "is more than an economic issue. It is a national security issue." *See id.* at 1072.

### iii. *Post–Import Suspension Actions taken by APHIS and the Spanish Government, leading up to the Final Rule*

Immediately after hearing reports that live Medfly larvae discoveries were made in clementines imported from Spain, a team of APHIS specialists visited Spain in mid-December 2001 to investigate the causes of the breakdown. *See* Spanish Clementine Program Technical Review, A.R. 1788–1800; *see* Gadh, A.R. 1055–56; *see* A.R. 1131. The APHIS review team visited clementine orchards, groves and packing houses throughout Spain, in addition to meeting with Spanish and Generalitat Valenciana government representatives.[8] *See* Gadh, A.R. at 1055–56. During APHIS' field visit to groves in the Autonomous Community of Valencia, "it became apparent that trapping and bait spray activities under industry control lacked both consistency and direct Ministry [of Agriculture] oversight." *See* Spanish Clementine Program Technical Review, A.R. 1789. APHIS deduced that "these programs are a voluntary 'best management practice' and that there are no adverse consequences for noncompli-

ance." *See id.* The APHIS review team surmised that "[m]any [Spanish] growers may not see the need to participate in established trapping and treatment protocols due to endemic fruit fly populations and the specific knowledge that fruit will be subject to cold treatment prior to being marketed in the United States." *See id.*

The review team was unable to determine the exact cause of the failure, but identified several conditions that may have contributed to an overwhelming larval presence: (1) unseasonably warm weather conditions; (2) higher than average fruit fly populations; (3) high host susceptibility of the early season clementine varieties; (4) low trap densities and inadequate bait spray applications; and (5) lack of any fruit cutting activities to adequately monitor larval populations. *See id.* In its final report, the APHIS review team "suggested that a more integrated system approach uncertainty by providing overlapping measures to strengthen several critical points in the certification process." *See* Doc. 24, Appendix 1, *APHIS Backgrounder*, "Plant Protection and Quarantine—Spanish Clementine", dated Jan. 9, 2002. APHIS believed that a "systems approach concept would provide additional quarantine security, even if one or more components of the overall protocol fail." *See id.* "Systems approach" is defined in 7 U.S.C. § 7702(18) as "a...set of phytosanitary procedures, at least two of which have an independent effect in mitigating pest risk associated with the movement of commodities." *See* 7 U.S.C. § 7702(18). The APHIS review team's visit to Spain led to a study and report required under 7 U.S.C. § 7712(e).[9]

---

8. The autonomous community of Valencia, situated on Spain's Mediterranean coast, accounts for 67 per cent of Spain's total citrus production. In Valencia, there are over 100,000 growers of citrus, whose respective groves and orchards total 183,000 hectares. *See* A.R. at 1793–94.

9. 7 U.S.C. § 7712(e) states in relevant part:

As a result, APHIS reviewed the evidence and issued a report entitled "Risk mitigation for tephritid fruit flies with special emphasis on risk reduction for commercial imports of clementines (several varieties of *Citrus reticulata*) from Spain using a Phytosanitary Hazard Analysis and Critical Control Point (PHAACP) system," in March 2002. *See* A.R. 373 (published on April 16, 2002, A.R. 371, 67 Fed. Reg. 18578). The purpose of the Risk Mitigation Analysis ("RMA") was to describe and evaluate the "systems approach" chosen by APHIS and other risk-mitigating measures associated with the importation of clementines from Spain. *See id.* Public comment was solicited for thirty (30) days after publication of the RMA, *see* A.R. 371, and was extended by notice in the Federal Register until June 14, 2002. *See* A.R. 321, 67 Fed.Reg. 36560–61.

The RMA concluded that two critical control points were essential to prevent the establishment of Medfly in citrus-growing areas of the United States: (1) the application of cold treatment [in transit and storage]; and (2) the limitation of pests in the field [in Spain]. *See* A.R. 1394. The RMA goal was to achieve "Probit 9" mortality, which is acknowledged to be "a historical, well-recognized benchmark in the area of phytosanitary security." *See* A.R. 1285. The term "Probit 9" refers to "a level or percentage of mortality (i.e., 99.9968 percent mortality or 32 survivors out of a million) caused by a control measure." *See id.* at 1284. Using the available evidence, APHIS determined that "the likelihood of a mated pair in fruit from Spain was less than one in two thousand years, considering the 95th percentile of the distribution (less than one in more than ten thousand years using the mean of the distribution), even assuming multiple containers shipped to suitable areas." *See* A.R. 1394. According to Ed Miller, an entomologist with APHIS' Risk Analysis Systems, the results of the RMA "show[ ] a minimization of the probability that a mated pair arrives at an area where it would cause trouble," when effective cold treatment and other control measures are in place. *See* A.R. 990–91. Miller emphasized that the key to success is "quality control," stating that "[w]e need documentation and verification and transparency and communication, and research and methods development." *See id.* at 991.

iv. *Adoption of the Rule*

The proposed rule, published in the Federal Register on July 11, 2002, harmonized the goals of APHIS in preventing Medflies from using clementines imported from Spain as a pathway for introduction and the goals of the U.S. and Spanish Governments in promoting trade. *See* A.R. 1129–40, 67 Fed.Reg. 45922–33. The rule, which

The Secretary shall conduct a study of the role for and application of systems approaches designed to guard against the introduction of plant pathogens into the United States associated with proposals to import plants or plant products into the United States...shall ensure the participation by scientists from State departments of agriculture, colleges and universities, the private sector, and the Agricultural Research Service... [and][n]ot later than 2 years after June 20, 2000, the Secretary shall submit a report on the results of the study conducted under this section to the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives.

According to Dr. Gadh, the APHIS team "could not come up with the exact cause of the problem, but identified many key factors that they believe contributed to the problem. And those were based on the data they got from Spanish officials of their trapping activities there." *See* A.R. 982; *see also*, A.R. 1056.

would require improved field control and quality control guidelines, represented a major improvement from the prior inspection regimen. *See id.* Major features of the proposed rule include:

- Requiring Spanish growers to register and enter into an agreement with the Spanish Government to follow a mandatory pest management program, established by the Spanish Government and approved by APHIS, before exporting to the United States;

- Improved monitoring and field control procedures designed to greatly reduce the number of viable Medfly larvae in clementines upon arrival to packing houses;

- Spanish Government and/or direct APHIS oversight to monitor and record compliance with the program, the number of Medflies caught in the traps and further compliance with FDA pesticide residue regulations;

- APHIS will oversee inspection and fruit cutting before cold treatment in order to detect Medfly larvae. If a single live Medfly is found in any shipment, the entire shipment will be rejected and no reconditioning or repackaging of fruit will be allowed. If live Medfly larvae are found in any two shipments from a particular grove or grower, that grove/grower will be removed from the U.S. Export Program for the remainder of the clementine season.

In addition, the proposed rule notified stakeholders that APHIS was soliciting comments for sixty (60) days, ending on September 9, 2002. *See* A.R. 1129, 67

Fed.Reg. 45922. Two public hearings were also held on August 20, 2002 in Oxnard, California, *see* A.R. 1050–1127, and on August 22, 2002 in Lake Alfred, Florida. *See* A.R. 973–1049. At the Oxnard Public Hearing, Dr. Gadh stated that "[the] conditions under which the Spanish clementines may be imported are that [the] Spanish government will have to institute a Medfly management program which is aimed to reduce the fruit fly infestation to less than 1.5 percent of the fruits." *See* A.R. 1057. Furthermore, the proposed rule and conditions under which imports may be resumed constitute "a full fledged pre-clearance program set up in Spain." *See id.*

As required by Executive Order 12866, 1993 WL 388305, APHIS prepared a Regulatory Impact Analysis ("RIA") on October 15, 2002, which concluded that regulatory benefits outweigh regulatory costs associated with implementation of the rule, *see* A.R. 1323, and that a regulatory flexibility analysis was not necessary because the proposed rule "will likely not have a significant economic impact on a substantial number of small Medfly host crop producers in the United States." *See* A.R. 1334; *see also,* A.R. 1318.

v. *The Final Rule*

On October 22, 2002, APHIS published the Final Rule, *see* 7 C.F.R. § 319.56–2jj (the Rule), effective October 15, 2002, which authorized the resumption of Spanish clementine imports, subject to several new remedial measures which had not existed under 7 C.F.R. § 319.56–2(e).[10] Un-

10. Prior to implementation of 7 C.F.R. § 319.56–2jj, there had been no particular regulation devoted to the importation of clementines from Spain, rather, importation was permitted under the more generalized regulations set forth at 7 C.F.R. § 319.56–2(e). 7

C.F.R. § 319.56–2(e) authorized the importation of any otherwise unrestricted fruit or vegetable which was found by the USDA Administrator to comply with the treatment procedure listed by the Plant Protection and Quarantine Manual (7 C.F.R. § 300.1), which

der the "new Rule" of 7 C.F.R. § 319.56–2jj, persons who produce clementines in Spain for export to the United States are required to register with the Government of Spain and enter into an agreement to participate and follow the Medfly management program established by the Spanish Government. The Rule requires the Spanish Government to obtain APHIS approval of Spain's Medfly management program which, in turn is subject to compliance monitoring by APHIS inspectors, and includes requirements for fruit fly specifications for trapping and recordkeeping. More specifically, the Rule requires Spanish producers to place traps in Medfly host plants at least 6 weeks prior to harvest and to utilize APHIS-approved pesticide bait treatments in the production areas at the rate specified by Spain's Medfly management program (also subject to APHIS approval).

The Rule also requires the Spanish Government to keep records documenting the trapping and control activities for all areas that produce clementines for United States export and to make these records available to APHIS upon request. If APHIS determines that an orchard does not operate in compliance with these regulations, it may suspend clementine exports to the U.S. from that orchard. All clementines imported to the U.S. under this rule, must be accompanied by a phytosanitary certificate stating that the fruit meets the conditions

required fruit to be held at the following temperatures:

| Temperature | Exposure Period (Days) |
| --- | --- |
| 32°F or below | 10 |
| 33°F or below | 11 |
| 34°F or below | 12 |
| 35°F or below | 13 |
| 36°F or below | 14 |

See 7 C.F.R. § 300.1. Nothing more than compliance with this procedure was required. Any additional preventative measures were taken only on a voluntary basis.

of the Government of Spain's Mediterranean fruit fly management program and applicable APHIS regulations. Under the Rule, boxes in which clementines are packed must be labeled with a lot number which identifies the orchard where the fruit was grown and the packinghouse where the fruit was packed and must display the following statement: "Not for distribution in AZ, CA, FL, LA, TX, Puerto Rico, and any other U.S. Territories." In addition, the rule provides that for each and every shipment of clementines intended for export to the United States, prior to cold treatment, APHIS inspectors will cut and inspect 200 fruit that are randomly selected from throughout the shipment and, should a single live Medfly in any stage of development be discovered, the entire shipment of clementines will be rejected.[11] If a live Mediterranean fruit fly in any stage of development is found in any two lots of fruit from the same orchard during the same shipping season, that orchard will be removed from the export program for the remainder of that shipping season. This random cut inspection is an added level of testing to enhance success of cold treatment efficacy.[12]

One of the most significant protective measures the Rule implements is the change in cold treatment protocol. A *revised* cold treatment schedule has been adopted and is incorporated by reference

11. The purpose behind this random "sample and cut" aspect of the Rule is to minimize the possibility of importing any lots with massive infestation.

12. "Given a large enough volume of infested fruit imports, even the probit 9 level of security could be overwhelmed." A.R. 1222 (excerpt, page 15, ORACBA "Quantitative Analysis of Available Data on the Efficacy of Cold Treatment against Mediterranean Fruit Fly Larvae," by Mark Powell).

at 7 C.F.R. § 300.1 in the Plant Protection and Quarantine (PPQ) Treatment Manual. Under this revised cold treatment schedule,[13] the minimum exposure period for cold treatment is fourteen (14) days, where the temperature applied is 34 degrees or below, ranging up to a requirement of sixteen (16) days if the temperature applied is 35 degrees or below, and up to a maximum requirement of eighteen (18) days, where the temperature applied is 36 degrees or below. A.R. 1288. These changes add a minimum of two days more of cold treatment for each degree of temperature rise above 32. For cold treatment at temperatures of 32 degrees or below, the Rule's application schedule adds four days; former application time was 10 days for 32 degrees, now, the minimum application period is 14 days. *Id.* The ORACBA analysis increases application periods for cold treatment to ensure even greater prevention than before, based on reliable studies that show that increasing the length of cold treatment applications yields substantially more protection than lowering the temperature. A.R. at 1211, 1220. Scientific study of cold treatment and the extent of its effectiveness in eradication of Medfly continues along with debate among researchers. A.R. at 1220–21. APHIS scientists opine that this revised cold treatment schedule will achieve a probit 9 level of mortality or even greater. A.R. at 1219, 1288.

Upon arrival of clementines at a United States port of entry, the Rule now requires APHIS inspectors to examine the cold treatment data for *each shipment* to ensure it has been continuous. If APHIS inspectors determine that the cold treatment was not successfully completed, the shipment will be held until appropriate remedial actions have been implemented. The Rule requires an APHIS inspector, at the port of first arrival, to sample and cut clementines from each shipment to detect pest infestation according to sampling rates determined by the Administrator. During this process, if a single live Medfly is found, the shipment will be held and subjected to further investigation and remedial action. The Rule further provides that, if at any time APHIS determines that the safeguards contained in this section are inadequate, it may suspend importation for further investigation as to any deficiency. *See* 7 C.F.R. § 319.56–2jj.

The Secretary expressly "determined that it is not necessary to prohibit the importation of clementines from Spain, in order to prevent the introduction into the United States or the dissemination within the United States of a plant pest or noxious weed." *See* A.R. 1283. The Secretary based her determination on the finding that the protective measures contained in the Final Rule will prevent the introduction of the Medfly into the United States. *See id.* In the rulemaking process, the Secretary was required to: utilize "sound science," use procedures that were "transparent and accessible," 7 U.S.C. § 7712(b), and to publish procedures and standards that governed consideration of import requests. 7 U.S.C. § 7712(d).

Factors that the Secretary considered, include: "(1) A risk management analysis (revised October 4, 2002), (2) a review of the existing cold treatment for clementines from Spain, 'Evaluation of cold storage treatment against Mediterranean Fruit Fly, *Ceratitis capitata* (Wiedemann) (Diptera: Tephritidae)' (May 2, 2002) ..., (3) a quantitative analysis of available data related to cold treatment for Medfly that

---

**13.** The rule amends the PPQ Treatment Manual with this revised cold treatment schedule only with regard to clementines imported from Spain. *See* A.R. 1134, 67 Fed.Reg. 45927.

was produced by USDA's Office of Risk Assessment and Cost Benefit Analysis (ORACBA) ..., and (4) the determinations of USDA technical experts." *See id.*

The Risk Management Analysis ("RMA") consists of an integrated study and evaluation of five component risks: (1) the number of fruit shipped (number of fruit per container and total amounts per year);[14] (2) fruit infested with larvae in the field;[15] (3) larvae per individual fruit;[16] the effects of cold treatment;[17]

14. A.R. at 1400–01. This portion of the analysis evaluated the amount of fruit exported per container (less than 166,294) as well as the amount of total fruit exported from Spain to the United States in one year (ca. 80,000 tons based on the 1999–2000 season). These figures were gathered in cumulative reliance upon: USDA, *Tropical products transport handbook, No. 668* (1987); personal communication with William Thomas, USDA APHIS PPQ, Supervisor, Port of Philadelphia, PA; personal communication with Ernest Santaballa, Coordinador Regional Inspeccion Sanidad Vegetal, MAPA, Valencia; personal communication with Wilmer Snell, APHIS PPQ PIM and Donna West, APHIS PPQ PIM; Central Limit Theorem, N; MAPA, *Anuario de estadisticas agroalimentarias*, pp. 280–88, (1999); Landolt, P., D. Chambers, and V.Chew, *Alternative to the use of provit 9 mortality as a criterion for quarantine treatments of fruit fly (Diptera:Tephritidae)-infested fruit*, J.Econ.Entomol 77:285–287 (1984); Whyte,C.F., R.Baker, J.Cowley, and D.Harte, *Pest establishment, a quantitative method for calculating the probability of pest establishment from imported plants and plant products, as a part of pest risk assessment*, NZ Plant Protection Centre Publications, No. 4, ISSN 1173–6704 (1996); Wearing, C.H., J.Hansen, C.Whyte, C.E.Miller, J.Brown, *The potential for spread of codling moth (Lepidoptera: Tortricidae) via commercial sweet cherry fruit: a critical review and risk assessment*, Crop Protection 20: 465–488 (2001); Vail, P., J.Tebbets, B.Mackey, and C.Curtis, *Quarantine treatments: a biological approach to decision-making for selected hosts of codling moth (Lepidoptera: Tortricidae)*, J.Econ.Entomol 86:70–77 (1993); Weems,H.V., *Mediterranean fruit fly, Ceratitis capitata (Wiedemann)(Diptera: Tephritidae)*, Entomol. Circ. 230, Florida Department of Agriculture and Consumer Services, Division of Plant Industry (1981); Steiner,L.F., Mitchell, W.C. and A.H.Baumhover, *Progress of fruit fly control by irradiation sterilization in Hawaii and Mariana Islands*, Internat.J.Appl. Rad.Isotopes 13:427–434 (1962); PNKTO (Pests Not Known to Occur in the United States of Limited Distribution) 18 (South American Fruit Fly), 26 (Mediterranean Fruit Fly).

15. A.R. at 1401–02. This portion of the analysis evaluated what proportion of fruit infested with Medfly in the field actually arrive at the packinghouse (ca. 5 per thousand). The fruit that arrives at the packinghouse represents that fruit which will be shipped and treated. This figure was accomplished based on cumulative reliance upon: AQIM (Agricultural quarantine inspection monitoring handbook), 2001; Steel, R. and J.Torrie, *Principles and Procedures of Statistics*, McGraw Hill, Inc., New York, NY, pp. 633 (1980); Vose,D., *Quantitative risk analysis*, J.Wiley and Sons, New York, pp. 418 (2000); Agusti,M., *Citricultura*, Ediciones Mundi–Prensa, Madrid, Spain, pp. 416 (2000); EPPO, *Data Sheet on Quarantine Organisms* (1979); personal communication with Ernest Santaballa, Coordinador Regional Inspeccion Sanidad Vegetal, MAPA, Valencia; Weems,H.V., *Mediterranean fruit fly, Ceratitis capitata (Wiedemann)(Diptera: Tephritidae)*, Entomol.Circ. 230, Florida Department of Agriculture and Consumer Services, Division of Plant Industry (1981); Planes, S. and J.M.Carrero, *Plagas del campo*, Ediciones Mundi–Prensa, Madrid, Spain, pp. 550 (1995); 2001 sampling results by USDA–APHIS–PPQ; Gould,W.P., *Probability of detecting Caribbean fruit fly (Diptera: Tephritidae) infestations by fruit dissection*, Florida Entomologist 78(3): 502–507 (1995); MAPA, *Maps, Medfly trap locations, research results and citrus phenology* (2001); and APHIS inspector's site visits to Spain.

16. A.R. at 1402–03. This component estimates the total number of medflies present per infested fruit (100 eggs or eight viable adults per fruit). This figure was accomplished based on cumulative reliance upon: Santabella,E., R.Laborda, M.Cerda, *Informe sobre tratamiento frigorifico de cuarentena contra Ceratitis capitata (Wied.) Para exportar mandarina clementines a Japon*, Univ.Polytecnica de Valencia, pp. 25 (1999); Leyva,J.L.,

and the likelihood of suitable hosts in the area where clementines are imported and the likelihood of an adult fly emerging from imported fruit finding host material before death.[18] Based upon the integrated application of these five components, the Risk Mitigation Analysis concluded that the probability that a pair of fruit flies

H.Browning, and F.Gilstrap, *Development of A. ludens in several hosts*, Environ.Entomol 20(4): 1160–1165 (1991); McDonald,P.T. and P.O.McInnis, *Ceratitis capitata: effect of host fruit size on the numbers of eggs per clutch*, Entomol.Ex.Appl. 37:207–13 (1985); Gillot, (1980); PNKTO (Pests Not Known to Occur in the United States of Limited Distribution) 18 (South American Fruit Fly), 26 (Mediterranean Fruit Fly); personal communication with William Thomas, USDA APHIS PPQ, Supervisor, Port of Philadelphia, PA; and Gould, W.P., *Probability of detecting Caribbean fruit fly (Diptera: Tephritidae) infestations by fruit dissection*, Florida Entomologist 78(3):502–507 (1995).

17. A.R. at 1403–04. This component considers the rate of survival post-application of cold treatment to be at most 32 in a million (ca. .000032 larvae survive treatment). This figure was accomplished based on cumulative reliance upon: USDA's Treatment Manual (1998); Liquido,N., K.Vick, and R.Griffin, *Quarantine Security for Commodities*, In: Bartlett, P, Chaplin, G. And R.van Velson (eds), *Plant Quarantine Statistics: a review. Horticultural Research and Dev. Corp.*, Sydney, Australia (1996); personal communication with C.E. Miller; Robertson,J. and H.Preisler, *Pesticide Bioassays with Arthropods*, CRC Press (1992); Back, E. and C.Pemberton, *Effect of cold storage temperatures upon the pupae of the Mediterranean fruit fly*, J.Agric.Res. 6(7):251–260 (1916); Fares,F., *The effect of cold storage on the hatchability of the Mediterranean fruit fly*, Agric.Res.Rev. (Cairo) 51(1):57–58 (1973); Flitters,N.E. and P.Messenger, *Effect of temperature and humidity on the development and distribution of Hawaiian and Mexican fruit flies*, J.RioGrandeValleyHort.Soc. 12:7–13 (1958); Hill,A., C.Rigney, and A.Sproul, *Cold storage of oranges as a disinfestations treatment against fruit flies Dacus tryoni and Ceratitis capitata*, J.Econ.Entomol. 81(1):257–260 (1988); Mason, A. and O.McBride, *Effect of low temperatures on the Mediterranean fruit fly in infested fruit*, J.Econ.Entomol. 28(5):297 (1934); Petty,F. and E.Griffiths, *Effective control of fruit fly by refrigeration*, S.Afric.Dept.Agric.Sci.Bull. 99 (1931); Nel,R.G.,

*The utilization of low temperatures in the sterilization of deciduous fruit infested with the immature stages of Mediterranean fruit fly, Ceratitis capitata*, Union.S.Afric.Sci.Bull. 155 (1936); Gould,W., J.Armstrong, J.Hansen, J.Cooley, *Cold Treatment recommendations* (2002); Baker,A.C., W.E.Stone, C.C.Plummer & M.McPhail, *A review of studies on the Mexican fruit fly and related Mexican species*, USDA Misc.Publ. 531:155 (1944); De Lima,C.P.F., A.Jessup, and R.McLauchlan, *Cold disinfestations of citrus using different temperature X time combinations*, Hort. Australia Ltd. Project No. CT96020 (2002); and USDA Memo from M. Powell to D. Reeves (2002).

18. A.R. at 1404–06. This component considers the amount of fruit that actually represents a hazard (fruit that is not consumed and is discarded into a suitable environment) estimated to be 5% of any given container. This figure was accomplished based on cumulative reliance upon: Miller,C.E., *Risk Assessment, Mediterranean fruit fly. Planning and Risk Analysis Systems, Policy and Program Development*, USDA APHIS, pp. 113 (1992); USDA, *USDA plant hardiness zone map*, Agriculture Research Service, Misc. Pub. No. 1475 (1990); Smith,H.T., *Medfly cooperative eradication program, final environmental impact statement*, USDA APHIS, Hyatsville, MD. Pp. 45–75 (1993); Dominguez,F., *Plagas y enfermedades de las plantas cultivadas*, Ediciones Mundi–Prensa, Madrid, Spain, pp. 821 (1998); Baker,A.C., W.E.Stone, C.C.Plummer & M.McPhail, *A review of studies on the Mexican fruit fly and related Mexican species*, USDA Misc.Publ. 531:155 (1944); Wearing,C.H., J.Hansen, C.Whyte, C.E.Miller, J.Brown, *The potential for spread of codling moth (Lepidoptera: Tortricidae) via commercial sweet cherry fruit: a critical review and risk assessment*, Crop Protection 20:465–488 (2001); and Roberts,R., C.Hale, T. van der Zwet, C.Miller, S.Redlin, *The potential for spread of Erwinia amylovora and fire blight via commercial apple fruit; a critical review and risk assessment*, Crop.Prot. 17, 19–28 (1998).

could be enter the United States under the proposed conditions would be less than .001 per year, or one in ten thousand years. A.R. 1408. The probability of a *mated* pair of Medfly being present in a single shipment would be less than one in a million (0.000001). A.R. 1425, Table 4d. The probability that these fruit flies could mate and produce viable larvae in order to repopulate is even more remote. A.R. 1409, 1425.

## III. *LEGAL STANDARDS*

### A. *SUBJECT MATTER JURISDICTION*

The Court "ha[s] an independent obligation to address *sua sponte* whether [it] has subject-matter jurisdiction." *Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir.1999). United States District Courts have jurisdiction over cases in which the United States is a party. 28 U.S.C. § 1331. As the validity of rulemaking by the United States Department of Agriculture, an agency of the United States is at issue, federal subject matter jurisdiction is properly invoked.

### B. *JUDICIAL NOTICE*

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." FED. R. EVID. 201(d).

Judicially noticed facts often consist of matters of public record, such as prior court proceedings, *see, e.g., Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988) (administrative materials), *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994)(city ordinances), *Toney v. Burris*, 829 F.2d 622, 626–27 (7th Cir.1987) (city ordinances and official maps), *Aiello v. Town of Brookhaven*, 136 F.Supp.2d 81, 86 n. 8 (E.D.N.Y.2001) (geological surveys and existing land use maps), and *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) (taking judicial notice of a filed complaint as a public record).

■ Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992).

### C. *SUMMARY JUDGMENT*

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c); *see also Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 899 (9th Cir.1993). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *See U.A. Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. A court's role on summary judgment, however, is generally not to weigh the evidence, *i.e.,* issue resolution, but rather to find genuine factual issues. *See Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in Rule 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir.1996); *Anheuser–Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *See United States v. One Parcel of Real Property,* 904 F.2d 487, 491–492 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show af-

firmatively that the affiant is competent to testify to the matters stated therein. *See* FED. R. CIV. P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom. Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

## D. SUMMARY ADJUDICATION

The purpose of Rule 56(d) is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation. *National Union Fire Ins. Co. v. L.E. Myers Co. Group,* 937 F.Supp. 276, 285 (S.D.N.Y.1996). An order under Rule 56(d) narrows the issues and enables the parties to more fully recognize their rights, while permitting the court to retain full power to adjudicate all aspects of the case at the proper time. *See* 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2737, at 455–56 (2d ed.1983).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. *Id.* at 457.

The obligation imposed upon the court by Rule 56(d), to specify the uncontroverted material facts, is generally compulsory. *See Woods v. Mertes,* 9 F.R.D. 318, 320 (D.Del.1949). However, if the court determines that identifying indisputable facts through partial summary judgment would not materially expedite the adjudicative process, it may decline to do so. *See*

WRIGHT, MILLER & KANE, *supra,* § 2737, at 460.

### E. *JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT*

When the court reviews a government agency's final action, the Rule 56(c) standard for summary judgment is amplified by 5 U.S.C. § 706(2) of the Administrative Procedure Act. Title 5 U.S.C. § 706 provides the applicable standard of review for agency action:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, Or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. Summary judgment in a case of judicial review of agency action requires the court to review the administrative record to determine whether the agency's action was "arbitrary and capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Environment Now! v. Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal.1994) (citing *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir. 1979)).

The parties have stipulated that this dispute can be decided on the administrative record and does not require the taking of evidence. *See* Doc. 25, Undisputed Statement of Material Facts, filed Mar. 24, 2003 at 2 (citing *Northwest Motorcycle Association v. United States Department of Agriculture,* 18 F.3d 1468, 1472 (9th Cir.1994) and *Environment Now! v. Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal.1994)). Plaintiffs challenge the validity of the October 15, 2002, Rule (hereinafter "the Rule"), authorizing Spanish importation of clementines to resume, after imports were suspended due to the presence of Medfly larvae, subject to revised conditions of phytosanitary inspections and treatment. *See* Doc. 24 at 3. *See also,* 67 Fed.Reg. 64702–64739, A.R. 1282—1319 (and particularly 67 Fed.Reg. 64708–11 and A.R. 1288–91). Plaintiffs seek to invalidate the Rule under 5 U.S.C. § 706 because: (1) the agency acted beyond its statutory authority (5 U.S.C. § 706(2)(C)); (2) the rule is arbitrary, capricious, and unlawful (5 U.S.C. § 706(2)(A)); (3) the agency promulgated the Rule in violation of procedures required by the Plant Protection Act

(PPA) and the Regulatory Flexibility Act (RFA); and/or it was adopted in violation of the National Environmental Protection Act (NEPA) (5 U.S.C. § 706(2)(D)). Doc. 24 at 10, 19, and 38.

Federal Defendants assert that *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) deference is owed to the agency's interpretation of the statutory requirements unless Congress's intent unambiguously requires a different interpretation. Doc. 32 at 21. Plaintiffs argue that *Chevron* deference has no application because statutory construction is not at issue. Rather, Plaintiffs contend that USDA failed to meet its legal obligations by promulgating an arbitrary and capricious rule, in excess of its authority, and in violation of various procedures required by law. Doc. 38 at 5.

■ Plaintiffs maintain that each ground upon which they seek to invalidate the Rule involves only questions of law, making the standard of review *de novo.* Doc. 24 at 10, fn. 38 (citing *Akiak Native Cmty. v. United States Postal Service*, 213 F.3d 1140, 1144 (9th Cir.2000) and *Environment Now! v. Espy*, 877 F.Supp. 1397, 1421 (E.D.Cal.1994)). Plaintiffs accurately note that questions of law are generally reviewed *de novo*, however, the Secretary's decision here does not include pure legal questions. Plaintiffs' attacks on the validity of the Rule require a review of the reasonableness of agency action, viewing the record as a whole. *See, e.g., Environment Now!*, 877 F.Supp. at 1421; *Samaritan Hospital*, 609 F.2d at 951.

Reasonableness is necessarily a question of fact. *See, e.g., California Dental Ass'n v. F.T.C.*, 224 F.3d 942, 958 (9th Cir.2000); *Continental T.V., Inc. v. G.T.E. Sylvania Inc.*, 694 F.2d 1132, 1135 (9th Cir.1982); *Betaseed, Inc. v. U & I, Inc.*, 681 F.2d 1203, 1228–29 (9th Cir.1982); and *Donnel-*

*ly v. U.S.*, 201 F.2d 826, 829 (9th Cir.1953). The issues raised present mixed questions of law and fact. The reasonableness of the USDA's actions must be considered in the context of the legal requirements of the applicable statutes (the APA, PPA, RFA and NEPA) to determine whether promulgation of the Rule was arbitrary and capricious, beyond the agency's authority, and/or in violation of procedures required by law.

A standard of *de novo* review does not govern here, as recognized in *Estate of Merchant v. C.I.R.*, 947 F.2d 1390, 1392–93 (9th Cir.1991) (citing *Pierce v. Underwood*, 487 U.S. 552, 557–63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); abrogating the *de novo* review standard of *McConney*, 728 F.2d at 1201). *Estate of Merchant* holds that when a district court reviews agency action, questions of whether the agency was "substantially justified," or "unreasonable" in taking the final action, are governed by the principle that substantial deference should be accorded the agency as finder of fact and review is for "abuse of discretion." *See Merchant*, 947 F.2d at 1392–93 (citing *Pierce*, 487 U.S. at 557–63, 108 S.Ct. 2541). *Pierce* observed that a trial court's determination of whether agency action was "substantially justified" was neither a clear question of law or of fact and, therefore, was most fairly treated as a question of fact, entitled to deference upon review. *Pierce*, 487 U.S. at 559–60, 108 S.Ct. 2541.

The agency action here requires determination of whether the USDA's investigatory procedures, compilation of data, and scientific analyses were reasonable, competent, informed and properly applied to support the decision to resume importation of Spanish clementines. *Environment Now*, 877 F.Supp. at 1421, recognizes that "[a]gency action will be set aside as arbitrary and capricious if the agency lacked

support in the administrative record for its factual assumptions or otherwise abused its discretion..." 877 F.Supp. at 1421 (citing *Ass'n of Data Processing v. Board of Governors of Federal Reserve System,* 745 F.2d 677, 683 (D.C.Cir.1984)). *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir.1986), reiterates the standard of review in the district court under 5 U.S.C. § 706; substantial deference to agency decisions and the court is limited to determine whether "a clear error of judgment has occurred and whether the agency based its decision upon consideration of relevant factors." *Id.* (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814). Reasonableness is judged by taking the administrative record as a whole. *Id.* at 766 (citing *Continental Oil Co. v. United States,* 184 F.2d 802, 820–21 (9th Cir.1950) and *Ashland Oil, Inc. v. Phillips Petroleum Co.,* 554 F.2d 381, 387–88 (10th Cir. 1975)).

"[T]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). This circuit recognizes a narrow scope of review applicable to agency action: "Assuming that statutory procedures meet constitutional requirements, the court is limited to a determination of whether the agency substantially complied with its statutory and regulatory procedures, whether its factual determinations were supported by substantial evidence, and whether its action was arbitrary, capricious or an abuse of discretion." *Toohey v. Nitze,* 429 F.2d 1332, 1334 (9th Cir.1970), *cert denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971). *See also Briggs v. Dalton,* 939 F.Supp. 753, 760 (D.Hawai'i 1996) (accord). Despite this "narrow" scope of review, the court is still expected to make a "thorough, probing, in-depth review" of the administrative record to ensure the validity of the agency action, *Overton Park,* 401 U.S. at 415, 91 S.Ct. 814, and "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814 (citing L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 359 at 182 (1965); *McBee v. Bomar,* 296 F.2d 235, 237 (6th Cir.1961); *In re Josephson,* 218 F.2d 174, 182 (1st Cir.1954); *Western Addition Community Organization v. Weaver,* 294 F.Supp. 433 (N.D.Cal.1968); and *Wong Wing Hang v. Immigration and Naturalization Serv.,* 360 F.2d 715, 719 (2nd Cir.1966)).

## IV. ANALYSIS

### A. JUDICIAL NOTICE

Federal Defendants request judicial notice of a published report of the United States Department of Agriculture, Animal and Plant Health Inspection Service (APHIS) entitled "Spanish Clementine Data Report and Analysis 2002–2003 Season" (the "2002–2003 Data Report"). Doc. 34 filed Apr. 28, 2003. Plaintiffs object to judicial notice of the 2002–2003 Data Report on the basis that it is irrelevant to the issues presented in the pending litigation because it was prepared after and is not part of the administrative record and it appears to have been prepared for the litigation making the validity of its contents suspect. Doc. 35, Objection to Judicial Notice, filed May 1, 2003, at 2. Intervenor Defendants support Federal Defendants request for judicial notice of the 2002–2003 Data Report, arguing that it is a relevant, self-authenticating government publication reflecting scientific data, factors considered, and acts taken by the USDA and supports the validity and correctness of USDA assump-

tions made in the underlying administrative proceeding and promulgation of the October 15th Final Rule. Doc. 36, Intervenor Defendant's Memorandum in Support of Federal Defendant's Request for Judicial Notice, filed May 8, 2003, at 2–3.

Intervenor Defendants seek judicial notice of a published government letter entitled "Clementine Stakeholder Letter" (the "Stakeholder Letter"). Doc. 39, Intervenor's Request for Judicial Notice, filed Jun. 10, 2003 at 2.

Plaintiffs object to Intervenor Defendants' request for judicial notice of the Stakeholder Letter on the basis of relevancy as it is not part of the administrative record, was prepared after the Rule was published, and has questionable reliability. Doc. 40, Plaintiffs' Objection to Judicial Notice, filed Jun. 16, 2003 at 2. In support of their request for judicial notice, Federal Defendants cite *Clappier v. Flynn*, 605 F.2d 519 (10th Cir.1979) and *Mobil Oil Corp. v. TVA*, 387 F.Supp. 498 (D.Ala. 1974). In *Clappier*, 605 F.2d at 535, the Tenth Circuit held that judicial notice was properly taken of an official government publication in the Federal Registry relating to hospital rates and charges concerning medical care furnished by the United States in an action for injuries whereby Plaintiff was treated at a government hospital. In *Mobil Oil*, 387 F.Supp. at 500, fn. 1, the Alabama district court held that an agency's annual reports were proper subjects for judicial notice.

Rule 902 of the Federal Rules of Evidence provides that the following documents are self-authenticating:

. . .

(4) Certified copies of public records. A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority.

(5) Official publications. Books, pamphlets, or other publications purporting to be issued by public authority.

. . .

(11) Certified Domestic Records of Regularly Conducted Activity. The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record—

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

. . .

Fed.R.Evid. Rule 902.

Fed.R.Evid. Rule 1005 provides:

The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with rule 902 or testified to be correct by a witness who has compared it with the original. If a copy which complies with the foregoing cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given.

Fed.R.Evid. Rule 1005.

Rule 44 of the Federal Rules of Civil Procedure provides:

An official record kept within the United States, or any state, district, or commonwealth, or within a territory subject to the administrative or judicial jurisdiction of the United States, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by the officer's deputy, and accompanied by a certificate that such officer has the custody. The certificate may be made by a judge of a court of record of the district or political subdivision in which the record is kept, authenticated by the seal of the court, or may be made by any public officer having a seal of office and having official duties in the district or political subdivision in which the record is kept, authenticated by the seal of the officer's office.

Fed.R.Civ.Proc. Rule 44(a)(1).

In *Woolsey v. National Transp. Safety Bd.*, 993 F.2d 516, 520 (5th Cir.1993) *rehearing denied* 3 F.3d 441, *cert. denied* 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d 459, articles and self-promotional statements made by an air transport company in a weekly magazine were admissible as self-authenticating documents. *See also, Dal-*

*las County v. Commercial Union Assur. Co.*, 286 F.2d 388, 391–92 (5th Cir.1961) (newspaper article admissible as secondary evidence); *D.L. v. Unified School Dist. # 497*, 270 F.Supp.2d 1217, 1235 (D.Kan. 2002) (newspaper articles admissible to show fact of publication and as evidence of an agent's statement); *Nestle Co., Inc. v. Chester's Market, Inc.*, 571 F.Supp. 763, (D.C.Conn.1983) *reversed on other grounds*, 756 F.2d 280, *on remand* 609 F.Supp. 588 (media articles were self-authenticating and admissible to show public perception and usage); *U.S. v. Leal*, 509 F.2d 122, 125–26 (9th Cir.1975) (foreign hotel registration forms were self-authenticating when prepared by public officials in carrying out duties of their office); *U.S. v. Saputski*, 496 F.2d 140, 142 (9th Cir.1974) (business records were self-authenticating so that signature was not prerequisite to admissibility in embezzlement lawsuit). *See* Fed.R.Evid. 803(8).

 A matter is not properly subject to judicial notice by the court if it involves a central and disputed issue. *U.S. v. Baker*, 641 F.2d 1311 (9th Cir.1981). However, a court may properly take notice of public facts and public documents. *Greeson v. Imperial Irr. Dist.*, 59 F.2d 529, 531 (9th Cir.1932). Public records, such as census data, is appropriate subject matter for judicial notice. *United States v. Esquivel*, 75 F.3d 545, 549 (9th Cir.1996). *But see, Carley v. Wheeled Coach*, 991 F.2d 1117, 1126 (3rd Cir.1993) (refusing to take notice of government's testing of vehicle rollovers as not "readily provable through a source whose accuracy cannot be reasonably questioned") and *Cofield v. Alabama Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir.1991) (refusing to take judicial notice of newspaper publication as source that establishes facts as indisputable).

In *Gafoor v. I.N.S.*, 231 F.3d 645, 655–56 (9th Cir.2000) judicial notice was taken of

evidence outside the Board of Immigration Appeals' administrative record, where such evidence was not previously available because the events had not yet occurred when the agency action was taken. *Rankin v. DeSarno*, 89 F.3d 1123, 1126 fn. 3 (3rd Cir.1996), took judicial notice of a financial publication's reporting of the prime rate. In *Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 254 fn. 4, 54 S.Ct. 416, 78 L.Ed. 777 (1934), judicial notice of various reports, treatises, textbooks, and other publications issued by the U.S. Comptroller of the Currency as evidence of good banking practices. *See also, Clemmons v. Bohannon*, 956 F.2d 1523, 1532 & fn. 2 (10th Cir.1992) (Seymour, J., dissent) (judicial notice of government reports), *Pueblo of Sandia v. U.S.*, 50 F.3d 856, 861 fn. 6 (10th Cir.1995)(*accord*). Courts will also take judicial notice of historical happenings and events. *Akira Ono v. U.S.*, 267 F. 359, 362 (9th Cir.1920).

■ *George W. v. U.S. Dept. of Educ.*, 149 F.Supp.2d 1195, 1199 (E.D.Cal.2000), recognizes a court may take judicial notice of a public record which has a "direct relation to the matters at issue," but only of the *existence* of those matters of public record (the existence of a public document or of representations in the document) but not of the *veracity* of arguments or disputed facts in the document. *Id.* (quoting *Robinson*, 971 F.2d at 248).

In *George W.*, a defendant sought judicial notice that a co-defendants' filed pleading be deemed its own. *Id.* The request for judicial notice of the contents and arguments of the motion was rejected, "[a] motion is a legal brief, advancing a partisan position in litigation, not a judicially noticeable fact." *Id.* The existence and authenticity of a document which is a matter of public record is judicially noticeable such as the authenticity and existence of a particular order, pleading, public proceeding, or census report, which are matters of public record, but the veracity and validity of their contents (the underlying arguments made by the parties, disputed facts, and conclusions of fact) are not. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.2001)(a court may take judicial notice of another court's opinion, but not of the truth of the facts recited therein); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290, fn. 1 (9th Cir.1996) (court may take judicial notice of the pleadings and court orders in earlier related proceedings); *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir.2003).

Even where, under the doctrine of *stare decisis*, a court is generally compelled to abide by conclusions of law made in prior proceedings of higher courts, a court cannot take judicial notice of another court's determination of the truth of those facts. *Lee*, 250 F.3d at 690 (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426–27 (3rd Cir.1999)).[19] *See also, Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir.2003) (while a court may judicially notice another court's order, it may not accept that court's findings of fact as true). *Lee* found that the district court properly took judicial notice of *the fact* that a waiver was signed in a prior proceeding, *Lee*, 250 F.3d at 689–90, but reversed the incorrect judicial notice of the *validity of that waiv-*

---

**19.** Judicial notice is distinguished from res judicata and collateral estoppel whereby a party is prevented from raising a claim or issue which has already been sufficiently addressed and decided in a prior proceeding where that party's interest was adequately represented. *See, e.g., Robinson*, 971 F.2d at 249–53; *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Thorley v. Superior Court*, 78 Cal.App.3d 900, 907, 144 Cal.Rptr. 557 (1978).

*er*, a disputed fact yet unproved. *Id.* at 690.

While the court may take judicial notice of the fact of filing or existence and the general meaning of words, phrases, and legal expressions, documents are judicially noticeable only for the purpose of determining what statements have been made, not to prove the truth of the contents. *See, e.g., Hennessy v. Penril Datacomm Networks, Inc.* 69 F.3d 1344, 1354–55 (7th Cir.1995); *Wilshire Westwood Assocs. v. Atlantic Richfield Corp.,* 881 F.2d 801, 803 (9th Cir.1989).

"Judicial notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice." *Del Puerto Water Dist. v. U.S. Bureau of Reclamation,* 271 F.Supp.2d 1224, 1234 (E.D.Cal.2003). *See also, California ex rel. RoNo, LLC v. Altus Finance S.A.,* 344 F.3d 920, 931 (9th Cir.2003) ("requests for judicial notice are GRANTED to the extent that they are compatible with FED. RULE EVID. 201 and do not require the acceptance of facts 'subject to reasonable dispute.'" Quoting *Lee,* 250 F.3d at 690); *Kent v. Daimlerchrysler Corp.,* 200 F.Supp.2d 1208, 1219 (N.D.Cal. 2002).

■ On the separate issue of relevancy, the fact the government publications have been created and reflect continuing focus on the efficacy of the Rule is relevant, even if the contents could not have informed the Rule. No request to augment the record was made and there is no way to evaluate the probative value and accuracy of the contents of these public documents. However, the fact of follow-up data collection bears on active experience with operation of the Rule. *Amoco Oil Co. v. Environmental Protection Agency,* 501 F.2d 722, 729 fn. 10 (D.C.Cir.1974); *American Pe-*

*troleum Institute v. Environmental Protection Agency,* 540 F.2d 1023, 1034 (10th Cir.1976) questioned by *Airport Communities Coalition v. Graves,* 280 F.Supp.2d 1207, 1212–13 (W.D.Wash.2003) (no "Monday morning quarterbacking") citing *Rybachek v. U.S. Environmental Protection Agency,* 904 F.2d 1276, 1296 (9th Cir.1990) (not appropriate for party to use post-decision information to sustain or attack agency's decision). The post-record submissions have only limited applicability to confirm the plausibility of predictions under the Rule or the truth or falsity of predictions.

Federal Defendants' motion for judicial notice of the fact of existence and authenticity of the 2002–2003 Data Report as created and published by the Department of Agriculture is GRANTED. To the extent Federal Defendants seek judicial notice of the accuracy and validity of the contents of the 2002–2003 Data Report, matters disputed by the Plaintiffs, Federal Defendants' request for judicial notice is DENIED. Intervenor Defendants' motion for judicial notice of the authenticity and existence of the Stakeholder Letter, as a self-authenticating government publication issued by the Department in the furtherance of its responsibilities, is GRANTED. To the extent Intervenor Defendants' seek judicial notice of the veracity and/or accuracy of any of the Letter's statements, disputed facts or conclusions of law, Intervenor Defendants' motion for judicial notice of the Stakeholder Letter is DENIED.

B. *THE USDA HAD AUTHORITY TO PROMULGATE THE OCTOBER 15, 2002 FINAL RULE*

The first inquiry is whether the agency acted within the scope of its authority to promulgate the Rule. *See, e.g., Schilling v. Rogers,* 363 U.S. 666, 676–77, 80 S.Ct.

1288, 4 L.Ed.2d 1478 (1960); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A reviewing court must decide whether the agency properly construed its authority on the particular facts and circumstances presented. *Id.* at 416, 91 S.Ct. 814. APHIS invokes the Plant Protection Act as authority to promulgate the October 15 Final Rule, permitting importation of Spanish clementines to resume. "APHIS believes that its decisionmaking is tied directly to the authority given to the Secretary of Agriculture by the Plant Protection Act." 67 F.R. 64702–01. The Plant Protection Act delineates the scope of the Secretary's authority and discretion:

> The Secretary [of Agriculture] may prohibit or restrict the importation, entry, exportation, or movement in interstate commerce of any plant, plant product, biological control organism, noxious weed, article, or means of conveyance, if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States or the dissemination of a plant pest or noxious weed within the United States.

7 U.S.C. § 7712(a). PPA sub (c) describes the method by which the Secretary may enforce its powers:

> The Secretary may issue regulations to implement subsection (a) of this section, including regulations requiring that any plant, plant product, biological control organism, noxious weed, article or means of conveyance imported, entered, to be exported, or moved in interstate commerce-
>
> (1) be accompanied by a permit issued by the Secretary prior to the importation, entry, exportation, or movement in interstate commerce;
>
> (2) be accompanied by a certificate of inspection issued (in a manner and form required by the Secretary) by appropriate officials of the country or State from which the plant, plant product, biological control organism, noxious weed, article, or means of conveyance is to be moved;
>
> (3) be subject to remedial measures the Secretary determines to be necessary to prevent the spread of plant pests or noxious weeds; and
>
> (4) with respect to plants or biological control organisms, be grown or handled under post-entry quarantine conditions by or under the supervision of the Secretary for the purposes of determining whether the plant or biological control organism may be infested with plant pests or may be a plant pest or noxious weed.

7 U.S.C. § 7712(c).

Due to increasing concern over biological terrorism, APHIS's authority was further expanded by 7 U.S.C. § 8320, enacted in June of 2002, which provides in relevant part:

> The Secretary of Agriculture (referred to in this section as the "Secretary") may utilize existing authorities to give high priority to enhancing and expanding the capacity of the Animal and Plant Health Inspection Service to -
>
> (1) increase the inspection capacity of the Service at international points of origin;
>
> (2) improve surveillance at ports of entry and customs;
>
> (3) enhance methods of protecting against the introduction of plant and animal disease organisms by terrorists;
>
> (4) develop new and improve existing strategies and technologies for dealing with intentional outbreaks of plant and animal disease arising from acts of ter-

rorism or from unintentional introduction, including -

(A) establishing cooperative agreements among Veterinary Services of the Animal and Plant Health Inspection Service, State animal health commissions ·and regulatory agencies for livestock and poultry health, and private veterinary practitioners to enhance the preparedness and ability of Veterinary Services and the commissions and agencies to respond to outbreaks of such animal diseases; and

(B) strengthening planning and coordination with State and local agencies, including—

(i) State animal health commissions and regulatory agencies for livestock and poultry health; and

(ii) State agriculture departments; and

(5) otherwise improve the capacity of the Service to protect against the threat of bioterrorism.

7 U.S.C. § 8320(a).

The Secretary of Agriculture's responsibilities for plant protection and quarantine have been delegated to APHIS and the Deputy Administrator of Plant Protection and Quarantine. 7 C.F.R. § 371.3. The PPA grants APHIS wide discretion to properly effect its statutory purpose. 7 U.S.C. § 7712(a) and (c). A decision lies beyond the scope of agency authority where its exercise of discretion is contrary to law. "The scope of an agency's discretion is bounded by law; an agency cannot justify a decision by reference to its discretionary authority, if the decision lies beyond the scope of the agency's discretion." *Farmworker Justice Fund, Inc. v. Brock,* 811 F.2d 613, 619–20 (D.C.Cir.) *vacated as moot,* 817 F.2d 890 (D.C.Cir.1987).

■ The agency must consider all necessary and relevant factors to afford substantial justification for the Rule. *See, e.g., State of Tex. v. EPA,* 499 F.2d 289, 297 (5th Cir.1974); *Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 845 (E.D.Va.1980); *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995); *Western Oil & Gas Ass'n v. Air Resources Board,* 37 Cal.3d 502, 208 Cal.Rptr. 850, 853, 691 P.2d 606 (1984). An agency should articulate the reasoning behind its findings but need not prepare formal findings of fact in support of its decision. *Id.* at 853–54, 691 P.2d 606.

■ "An agency is entitled to select any reasonable methodology and to resolve conflicts in expert opinion and studies in its best reasoned judgment based on the evidence before it." *Intercitrus, Ibertrade Commercial Corp. v. United States Dept. of Agriculture,* 2002 WL 1870467, *2 (E.D.Pa.)(citing *Hughes River Watershed v. Johnson,* 165 F.3d 283, 289–90 (4th Cir. 1999) and *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir. 1987)). The complaining party bears the burden of a "clear showing" that the action exceeded the agency's authority. *International Drilling & Energy Corp. v. Watkins,* 920 F.2d 14, 19 (C.A.Em.App.1990). Plaintiffs concede that APHIS "has discretion in determining what prohibition or restriction is necessary to prevent the introduction of a plant pest into the United States." Doc. 24 at 16. Plaintiffs complain that APHIS has taken "unfettered license to exercise its discretion arbitrarily and without articulating a transparent standard," as required by *Harlan Land Co. v. U.S. Dept. of Agriculture,* 186 F.Supp.2d 1076, 1086–87 (E.D.Cal.2001) and *Ober v. Whitman,* 243 F.3d 1190, 1195 (9th Cir.2001). *Id.* at 15–16.

Based on the completeness of APHIS's investigation into the causes of Medfly lar-

vae importation into the United States,[20] and according due deference to the agency's findings of fact, determinations of reasonableness, practicality, and supporting scientific conclusions,[21] APHIS acted within the scope of its authority to issue protective rules under the Plant Protection Act in adopting the Rule. The new Medfly larvae prevention methodology and additional safeguards on Spanish clementine imports is a reasonable method of protecting the United States and its agriculturists from Medfly importation and threat of infestation. "Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority." *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

## C. *THE RULE IS NOT ARBITRARY AND CAPRICIOUS*

Plaintiffs claim that APHIS's promulgation of the Rule was arbitrary and capricious because the "information, analysis, and explanation that APHIS has offered in support of the Rule are insufficient to provide assurance that a 'catastrophic failure of the APHIS import program, will not occur." Doc. 24 at 3–4. The government responds that the agency's ten month analysis and argument among its scientists on likely cause for the 2001 Medfly presence fully satisfy 7 U.S.C. § 7701's "sound science" requirement. Plaintiffs argue that the agency was required to establish a definitive numeric threshold of minimum risk as part of the Rule. The government rejoins that this is an issue implicating the Secretary's rulemaking authority, subject to judicial deference.

The Administrative Procedure Act (APA), 5 U.S.C. § 553, establishes the procedural requirements applicable to notice and comment for an agency's rule-making

authority. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 523–24, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). A reviewing court must assure that the agency has given adequate consideration to all relevant factors in the administrative record in making its decision. *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The PPA, 7 U.S.C. § 7701(3), contains an express grant of discretionary authority to the Secretary to promulgate the Rule:

> ... to facilitate exports, *imports*, and interstate commerce in agricultural products and other products that pose a risk of harboring a risk of plant pests... in ways that will reduce *to the extent practicable as determined by the Secretary*, the risk of dissemination of plant pests...

7 U.S.C. § 7701(3)(*emphasis added*).

■ *Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Administration*, 342 F.3d 924, 928 (9th Cir.2003) recognized that agency action is arbitrary and capricious where: (1) the agency relies on factors which Congress did not intend the agency to consider, (2) the agency entirely fails to consider particularly relevant factors, (3) the agency provides an explanation for the decision which is contradicted by the evidence, or (4) the agency decision is so implausible that it cannot be said to be a mere difference of interpretation or the product of the agency's expertise. *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

---

**20.** *See infra* Part C.v-vii.

**21.** *See infra* Part C.v.

*Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Judicial review of an agency's findings of fact proceeds under the rubric of "substantial evidence" set forth in 5 U.S.C. § 706(2)(E). *See Information Providers' Coalition for Defense of the First Amendment v. F.C.C.,* 928 F.2d 866, 869–70 (9th Cir.1991). Substantial evidence "does not mean a large or considerable amount of evidence, but rather only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 870 (quoting *Pierce v. Underwood,* 487 U.S. 552, 564–65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) and *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). *See also, Tiger International, Inc. v. CAB,* 554 F.2d 926, 935–36 (9th Cir.1977); *Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *California Citizens Band Ass'n v. U.S.,* 375 F.2d 43, 53–54 (9th Cir.) *cert denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); *Hughes Air Corp. v. CAB,* 482 F.2d 143 (9th Cir. 1973).

> [Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

*Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

"The agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transportation v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)(quoting *Burlington Truck*

*Lines v. U.S.,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." 419 U.S. at 285–86, 95 S.Ct. 438 (citing *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945)). Because the administrative record reflects that APHIS adequately addressed the relevant facts, engaged in sufficient scientific analysis, and reasonably applied its investigatory conclusions in the process that created the Rule, the agency did not act arbitrarily or capriciously in promulgating the Final Clementine Re-import Rule.

### i. Adequacy of the Administrative Record

█ The starting point for judicial review of agency action is the administrative record already in existence, not a new record made initially in the reviewing court. *Southwest Center for Biological Diversity v. U.S. Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996); *Asarco, Inc. v. U.S. EPA,* 616 F.2d 1153, 1159 (9th Cir. 1980). The court may, however, consider evidence outside the administrative record for certain limited purposes, *e.g.,* to explain the agency's decisions, or to determine whether the agency's course of inquiry was insufficient or inadequate. *See id.; Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir. 1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).[22] The agency's follow-

---

22. *Animal Defense Council* states in relevant part:

When [ ] a failure to explain agency action effectively frustrates judicial review, the court may 'obtain from the agency, either

up reflected in its submission accompanying the Request for Judicial Notice seeks to explain and demonstrate sufficiency of the administrative record investigations and decision-making. A court, in certain instances, may require supplementation of the record or allow a party challenging agency action to engage in limited discovery. *Southwest Center*, 100 F.3d at 1450. In *Public Power Council v. Johnson*, 674 F.2d 791 (9th Cir.1982), the Ninth Circuit isolated four instances where supplementation or discovery may be justified:

(1) when the record need be expanded to explain agency action;

(2) when the agency has relied upon documents or materials not included in the record;

(3) to explain or clarify technical matter involved in the agency action and

(4) where there has been a strong showing in support of a claim of bad faith or improper behavior on the part of the agency decision makers.

*Id.* Supplementation of an administrative record is the exception, not the rule. *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 751 F.2d 1287, 1324 (D.C.Cir.1984). "If the administrative record is inadequate to explain the action taken, the preferred practice is to remand to the agency for amplification." *Sears Sav. Bank v. Fed. Sav. and Loan Ins. Corp.*, 775 F.2d 1028, 1030 (9th Cir.1985)(citing *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir.1982) and *Overton Park*, 401 U.S. at 420, 91

S.Ct. 814). The A.R. here consists of twelve volumes, and over three thousand (3,421) pages of scientific testing, application and analysis, risk assessments, environmental assessments, economic assessments, national and international impact assessments and cumulative, well-reasoned explanations for the "how" and the "why" underlying APHIS's promulgation of the Final Rule. *See* A.R. 1282–1319, 67 Fed. Reg. 64702–64739. Other than the judicial notice requests, only following year results have been offered beyond the administrative record.

ii. *Distinguishing Harlan Land Co. v. U.S.D.A.*

Plaintiffs contend that, under the doctrine of *stare decisis, Harlan Land Co. v. U.S. Dept. of Agriculture,* 186 F.Supp.2d 1076 (E.D.Cal.2001) compels a finding that APHIS's promulgation of the Rule is arbitrary and capricious because the agency failed to define "an acceptable level of risk." Doc. 24 at 12–15. Plaintiffs misconstrue the application of *stare decisis* in ascribing a precedential effect to *Harlan Land* and fail to distinguish the administrative record in this case from the *Harlan* administrative record.

█ "The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another." *Starbuck v. City of San Francisco*, 556 F.2d 450, 457 n. 13 (9th Cir.1977). *See also, People of Territory of Guam v. Yang*, 800 F.2d 945, 949

through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.' *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. *Hintz,* 800 F.2d at 829.

The district court may also inquire outside of the administrative record 'when it appears the agency has relied on documents or materials not included in the record.' *Id.* In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. *Id.* 840 F.2d at 1436.

(9th Cir.1986); *Dougherty v. Golden Gate Bridge,* 31 F.Supp.2d 724, 730 (N.D.Cal. 1998); *Willner v. Budig,* 848 F.2d 1032, 1035 (10th Cir.1988) *cert denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989); *Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371, n. 7 (3rd Cir.1991). Rather, "[s]uch decisions will normally be entitled to no more weight than their intrinsic persuasiveness [on the] merits ... because the responsibility for maintaining the law's uniformity is a responsibility of the appellate rather than trial judges..." *Colby v. J.C. Penney Company, Inc.,* 811 F.2d 1119, 1124 (7th Cir.1987). No trial court decision is binding precedent. *Hart v. Massanari,* 266 F.3d 1155, 1163 (9th Cir.2001); *In re Executive Office of the President,* 215 F.3d 20, 24 (D.C.Cir.2000) (district court decisions do not establish law of the district).

The administrative record in *Harlan Land* raised different issues based on an entirely different agency rule. It does not control the validity of the Rule challenged here. The administrative record underlying APHIS's October 15th Final Rule deals *exclusively* with the importation of clementines from Spain and prevention of Medfly infestation, which is supported by an extensive record of scientific inquiry and analysis by the agency. *Harlan Land* addressed a different APHIS rule which dealt exclusively with the importation of citrus from Argentina. The *Harlan* focus was on prevention of introduction into the United States of citrus black spot and sweet orange scab. There, as here, there was dispute whether sound science was reasonably employed in the promulgation of *that rule.* 186 F.Supp.2d at 1079–80. There, substantial evidence showed the apparent unreliability or inconsistency in testing by the agricultural authority for Argentina.

The *Harlan Land* administrative record did not explain what constituted an acceptable "negligible" level of risk, but rather concluded, *without* supporting scientific justification, that the risk posed by the proposed rule would be "negligible." 186 F.Supp.2d at 1080. *Harlan Land* held that the administrative record did not reflect the scientific analysis employed to reach the agency's conclusion, which left the court without any method to review the reasonableness of that conclusion. *Id.* "An agency must cite to information to support its position; without data the court owes no deference to an agency's line-drawing." *Id.* (citing *Ober v. Whitman,* 243 F.3d 1190, 1195 (9th Cir.2001)). The administrative record must contain sufficient reliance on sound science to support the reasonableness of the agency's final action.

An administrative record which fails to identify or reflect what scientific investigation and analysis has been applied to create a final rule leaves the court with nothing but the agency's conclusions to analyze. *Harlan Land* concluded the absence of record information prevented verification that a reliable basis existed for the Agency to conclude the risk posed by that proposed rule was "negligible," especially where there was contradictory scientific evidence. *Id.* at 1086. When an agency fails to justify, through the utilization of sound science, how and why a proposed rule will achieve its proposed objectives, "the court has no basis for determining whether [the agency's] decision is arbitrary, capricious or an abuse of discretion[.]" *Id.*

■ By contrast, the administrative record for the Rule here, concerning prevention of Medfly infestation from importation of Spanish clementines, includes ex-

tensive timely scientific studies[23] and analyses[24] which the agency expressly relied upon to explain how it reached its conclusion.[25] The studies include temperature control and cold treatment protocols, prior experience in eliminating Medflies, supported by statistical studies of success rates for temperature control and cold treatment testing to establish a probit 9 mortality as a zero tolerance target. The law mandates deference to APHIS's technical expertise and experience in conducting these analyses and the efficacy of the resulting findings, unless Plaintiff can cast doubt on its reliability by contrary science. *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556 (9th Cir.2000); *United States v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989).

iii. *Ober v. Whitman*

Plaintiffs cite *Ober v. Whitman,* 243 F.3d 1190, 1195 (9th Cir.2001) to support their contention that APHIS's explanation and application of science did not quantify an acceptable measure of risk and that such failure is fatal to the validity of the October 15th Final Rule. Doc. 24 at 15–17. In *Ober,* Arizona residents challenged the EPA's adoption of a Clean Air Act, 42 U.S.C. § 7401, *et seq.,* implementation plan which exempted from control, as de minimis, i.e., a "negligible contribution," airborne particulate matter under ten microns (PM–10). 243 F.3d at 1192, 1194. The rule was upheld because EPA met its burden to examine relevant data and articulate a satisfactory explanation, rationally connecting facts found and choices made. The agency fully explained its adoption of de minimis controls based on negligible contributions to the overall air pollution levels and the effect of applying those controls to sources of pollution. *Id.* at 1194–95 (citing 57 Fed.Reg. at 13,541).

**23.** *See, e.g.,* "Quantitative Analysis of Available Data on the Efficacy of Cold Treatment against Mediterranean Fruit Fly Larvae," July 5, 2002, at A.R. 1207–1224; "Fruit Fly Cooperative Control Program, Final Environmental Impact Statement" (2001), 67 Fed.Reg. 64727, A.R. 1307 (available at http://www.aphis.usda.gov/ppd/es/ppq/fffeis.pdf); De Lima, C.P.F., A. Jessup, and R. McLauchlan.2002. "Cold disinfestations of citrus using different temperatures X time combinations." *Horticulture Australia Ltd. Project Number: CT96020,* 67 Fed.Reg. 64708, A.R. 1288; Landolt, P., D. Chambers, and V. Chew.1984. "Alternative to the use of probit 9 mortality as a criterion for quarantine treatments of fruit fly (Diptera: Tephritidae)-infested fruit." *J. Econ. Entomol 77: 285–287,* 67 Fed.Reg. 64717, A.R. 1297; Synopsis of APHIS review of cold treatment records of ports of Philadelphia, PA and Elizabeth, NJ; Synopsis of APHIS study tracing initial interceptions in 2001 to be traced to particular vessels, "M/V Japan Senator" and "M/V Green Maloy," A.R. 1289.

**24.** *See, e.g.,* "Risk Mitigation Analysis" at A.R. 1392–1460 (notice and comment provided at 67 Fed.Reg. 18578–79, *and extended at* 67 Fed.Reg. 36560–61); "Office of Risk Assessment and Cost Benefit Analysis" ("ORACBA Analysis") at A.R. 1461–1479; "Regulatory Impact Analysis," A.R. 1320–91; Wearing, C.H., J. Hansen, C. Whyte, C.E. Miller, J. Brown.2001. "The potential for spread of codling moth (Lepidoptera: Tortricidae) via commercial sweet cherry fruit: a critical review and risk assessment." *Crop Protection 20: 465–488,* 67 Fed.Reg. 64717, A.R. 1297; Roberts, R.C. Hale, T. Van der Zwet, C.Miller, S. Redlin.1998. "The potential for spread of Erwinia amylovora and fire blight via commercial apple fruit; a critical review and risk assessment." *Crop. Prot. 19–28, Id.;* Whyte, C.F., R. Baker, J. Cowley, and D. Harte.1996. "Pest establishment, a quantitative method for calculating the probability of pest establishment form imported plants and plant products, as a part of pest risk assessment." *NZ Plant Protection Centre Publications, No. 4, ISSN 1173–6704. Lynfield, NZ., Id.;* Analyses of hypergeometric sampling rates and Confidence/percentage of infestation Chart at 67 Fed.Reg. 64712–13, A.R. 1292.

**25.** 67 Fed.Reg. 64702–64739, A.R. 2182–1319.

*Ober* upheld the "de minimis" exemption on the basis that it would be unreasonable to require agency control over such minute sources of pollution. *Id.* (citing 57 Fed. Reg. at 13,541 and *Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C.Cir.1979)).

It is commonplace, of course, that the law does not

> concern itself with trifling matters, and this principle has often found application in the administrative context. Courts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort... The ability ... to exempt *de minimis* situations from a statutory command is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design.

*Ober* at 1194 (quoting *Alabama Power,* 636 F.2d at 360 and citing *Industrial Union Dept., AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 663–64, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (also citing *Alabama Power* )).

The October 15th Final Rule does not seek to exempt any Medfly or Spanish clementine importation from the new and more stringent preventative safeguards required: "[O]ur actual target infestation level of fruit is zero..." 67 Fed.Reg. 64712, A.R. 1292. APHIS's goal is to *absolutely prevent* Medfly larvae infestation from occurring in the United States. A.R.

1283, 67 Fed.Reg. 64703.[26] The Final Rule achieves this stated purpose through methods which, according to APHIS's investigation and scientific analyses, will reasonably minimize the risk of importation of live larvae to a probit 9 mortality[27] level. A.R. 1283, 67 Fed.Reg. 64703.

APHIS's risk analysis for the October 15th Final Rule is only one aspect of the rule-adopting process. The record explains that the very minute risk of importation of larvae that might actually survive the Final Rule's protective measures is further reduced by domestic preventative measures (upon importation to the United States). Sampling and quarantine minimize the chances that any surviving larvae that reach the U.S. could mature into adults or adults capable of reproduction. A.R. 1222. APHIS's research and scientific studies show that a single Medfly larva able to survive the Rule's measures must *also* be capable of maturing, becoming reproductive, and *then* meeting *another* larva that was able to survive the preventative measures (one in two thousand years), and still be able to mature, become reproductive, and mate, before a Medfly infestation is possible. *Id.* The likelihood of this "perfect risk" scenario, while scientifically possible, is more remote considering the hard scientific data about the effectiveness of more cold treatment and the Rule's extensions of cold treatment minimum time-length requirements. A.R. 1215.[28]

---

26. APHIS explains that promulgation of the Final Rule "is based on the finding that the application of the remedial measures contained in this final rule *will prevent* the introduction or dissemination of plant pests into the United States." 67 Fed.Reg. 64703. A.R. 1283.

27. "Probit 9 mortality" is described as "[a] level or percentage of mortality of target pests (i.e., 99.9968 percent mortality or 32 survivors out of a million) caused by a control measure." 67 Fed.Reg. 64703, fn. 3.

28. Table 4 of the July 5, 2002, "Quantitative Analysis of Available Data on the Efficacy of Cold Treatment against Mediterranean Fruit Fly Larvae," by Mark Powell, illustrates the recognized studies of cold treatment efficacy (Nel, 1936; Sproul, 1976; Hill, 1988; Jessup, 1993; Santaballa, 1999; and APHIS, 2002 survey study). Each study tested different numbers of larvae against varying cold treatment applications where temperature and length of treatment factored into the overall efficacy of the treatments. Additionally, each study tested different host factors, i.e., lem-

Plaintiffs argue that Defendants' failure to set an exact numeric threshold of what they deem "acceptable risk" constitutes unreasonable acquiescence in and acceptance of the risk: that two Medfly larvae able to survive the Rule's preventative measures, both still maintaining their capability to simultaneously mature into reproductive adults, despite the cold treatment, *at approximately the same level of development* and *in the same vicinity* could find each other and actually reproduce, and thereafter not be detected in time, to cause an actual infestation. A.R. 328, 330–31. This risk scenario is so hypothetically remote as to be de minimis in the sense *Ober* recognizes. Such a "risk" need not be "numerically quantified" because the level of acceptable risk is set at zero. APHIS does not seek to exempt from regulation and allow the importation into the U.S. of a de minimis or negligible amount of Medfly larvae. Rather, APHIS seeks to entirely eliminate the risk of Medfly infestation, to the extent practical through known science. A.R. 1292. The PPA does not require setting a "numeric risk" threshold, which would be artificial and uncalled for under the totality of the circumstances.

The agency has explained and defined how its analyses, studies, and procedures that support the Final Rule, and how the use of inspection, field treatment or sampling, quarantine, extended cold treatment, arrival point inspection and testing will eliminate risk and operate to achieve the goal of probit 9 mortality. A "negligible

risk" standard is a non sequitur in the context of the Rule. Plaintiffs do not have the power to impose their views to rewrite the Rule, or to interpret the Rule to say what it does not. The Final Rule has no tolerance for any introduction of Medfly larvae; rather it seeks to eliminate all risks of introduction *to the extent practical through sound science.* There is no level of "acceptable" risk or "numeric threshold" to quantify. The law does not require idle acts.

APHIS reasonably explained the risks of Medfly importation, the means sought to minimize those risks to the extent practical through sound science, and reasonably incorporates its analyses into the justification of the Rule. The process was open to the public. APHIS is entitled to deference in interpreting the PPA and in using its expertise to promulgate a rule to achieve PPA statutory objectives. *See, e.g., Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556 (9th Cir.2000); *United States v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

APHIS has no obligation to create a numeric threshold to represent a level of risk that Plaintiffs seek to define. Where no risk is acceptable, the competence of the Rule to achieve that objective is measured by the cumulative circumstances and the science and technology available at the time of the final action. That has been done. Neither law nor logic requires an

ons, nuts. The only study which involved cold treatment of clementines, Santabella (1999), tested a population range from 935 larvae to 10,376, each at 35.6 degrees Fahrenheit (2 degrees Celcius). The Santabella study revealed: (1) out of 935 larvae, 24 survived an eight day treatment; (2) out of 935 larvae, 10 survived a ten day treatment; (3) out of 935 larvae, 5 survived twelve days of treatment; (4) out of 935 larvae, 0 survived 14

days of treatment; (5) out of 11,317, 0 survived 16 days of treatment; (6) on another test involving 10,295 larvae, 0 survived 16 days of treatment; and (7) on another test involving 10,376 larvae, 0 survived 16 days of treatment. (Compare to the Hill (1988) study which treated 41,099 larvae for 16 days at 34.7 degrees Fahrenheit/1.5 degrees Celcius. Three (3) of the 41,099 larvae survived).

agency to quantify a numeric threshold of "acceptable risk" every time risk prevention is sought to be achieved by an agency rule.

### iv. *Pearson v. Shalala*

*Pearson v. Shalala,* 164 F.3d 650 (D.C.Cir.1999), requires an agency to "define the criteria it is applying," when engaging in a discretionary rule-making determination. *Id.* at 660. In *Pearson,* the FDA rejected applications for approval of statements contained in dietary supplement labeling on the basis that the proposed statements were not supported by "significant scientific agreement." *Id.* *Pearson* found that the FDA's conclusory explanation that the proposed dietary labeling was not supported by "significant scientific agreement," *without more,* was not a reasonable explanation for the FDA's rejection: "[W]e agree with appellants that the APA requires the agency to explain why it rejects their proposed health claims—to do so adequately necessarily implies giving some definitional content to the phrase 'significant scientific agreement.' " 164 F.3d at 660. *Pearson* found that the FDA could not simply rely upon the statement that the labels' statements lacked "significant scientific agreement" as justification for their rejection, without providing some explanation as to what criteria was considered in reaching that conclusion. *Id.*

Here, APHIS does not merely state, as justification for the Final Rule, that the Rule is reasonable, "because it minimizes the risk to an acceptable level." Rather, APHIS provides a series of analyses which show *how, why,* and *to what extent,* the new import requirements of the Final Rule will eliminate the risk of Medfly infestation to as reasonable a degree of certainty as practical utilizing sound science and available technology. A.R. 1222. To require more would place an undue burden on APHIS to apply science and/or technology not yet recognized, or in the alternative, require APHIS to unnecessarily restrict trade on the basis that all risk is not (nor may it ever be) capable of being eliminated *entirely.*[29]

### v. *Shalala v. Guernsey Memorial Hospital*

It is not the court's function to direct an agency's rule-making. The circumstances surrounding APHIS's promulgation of the Rule, permitting importation of Spanish clementines to resume subject to new preventative measures aimed at eliminating the risk of Medfly introduction, are also subject to the Supreme Court's approach in *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995).

In *Guernsey Memorial Hospital,* a Medicare provider (the "Hospital") sought reimbursement for defeasance losses on the issuance of new bonds to be fully recognized within the year of refinancing. *Id.* at 90, 115 S.Ct. 1232. The Secretary of Health and Human Services ruled that reimbursement for such losses should be amortized over the life of the old bonds. *Id.* The Hospital argued that the Secretary's ruling contradicted "generally accepted accounting principles" with which she was required to comply under an applicable regulation.[30] *Id.* at 90–91, 115 S.Ct. 1232. The Hospital challenged the

---

**29.** According to the October 4, 2002, Risk Mitigation Analysis, APHIS's analysis "showed that the likelihood of a mated pair in fruit from Spain was less than one in two thousand years, considering the 95th percen-

tile of the distribution (less than one in more than 10,000 years using the mean of the distribution)." A.R. 1394.

**30.** 42 C.F.R. § 413.20(a).

Secretary's ruling on the basis that she failed to demonstrate that amortization was supported by "generally accepted accounting principles." *Id.* The Sixth Circuit reversed the District Court decision upholding the Secretary's position, because the governing regulations contained "a 'flat statement' that generally accepted accounting principles 'are followed' in determining Medicare reimbursements." *Id.* at 91, 115 S.Ct. 1232 (citing *Guernsey Memorial Hospital v. Secretary of Health and Human Services,* 996 F.2d 830, 833 (6th Cir.1993) (quoting 42 C.F.R. § 413.20(a))).

The Supreme Court reversed, holding that 42 C.F.R. § 413.20(a)'s requirement that "generally accepted accounting principles" be utilized for "[s]tandardized definitions, accounting, statistics, and reporting practices," did *not* limit the Secretary's discretion in making reimbursement decisions. *Id.* at 93, 115 S.Ct. 1232.

> The Secretary's reading of her regulations is consistent with the Medicare statute. Rather than requiring adherence to GAAP, the statute merely instructs the Secretary, in establishing the methods for determining reimbursable costs, to 'consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment ... to providers of services.' Nor is there any basis for suggesting that the Secretary has a statutory duty to promulgate regulations that, either by default rule or by specification, address every conceivable question in the process of determining equitable reimbursement.

*Id.* at 95–96, 115 S.Ct. 1232 (quoting 42 U.S.C. § 1395).

To determine an agency's obligations under a particular set of statutes or regulations, the Court looks not only to the text of the statutes and regulations, but also to "the overall structure of the regulations." *Id.* So long as the agency's interpretations of the overall structure of the authoritative statutes and regulations are reasonable, a Court must defer to the agency's determinations. *Id.* at 94–95, 115 S.Ct. 1232 (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); quoting *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) and *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986)).

The specialized expertise of a particular agency often requires deference to its discretionary functions, particularly when an agency's responsibilities involve regulation of an ever-evolving field.

> Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers[.]

*Id.* at 95, 115 S.Ct. 1232, quoting *Martin,* 499 U.S. at 151, 111 S.Ct. 1171.

Where the enabling statutes defer to agency discretion, such discretion should be upheld unless contradictory to the stated purpose of the regulation or otherwise contrary to law. *See, e.g., Hunt v. CIA,* 981 F.2d 1116, 1119 (9th Cir.1992) (in evaluating Central Intelligence Agency's claim of exemption from Freedom of Information Act, court must give substantial weight to CIA's affidavits); *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir.1992) (Secretary of Health and Human Service's denial of social security benefits is conclusive and will not be overturned absent lack of substantial evidence or legal error); and *U.S. v. Alpine Land & Reservoir Co.,* 887

F.2d 207, 213 (9th Cir.1989), *cert denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35, (deference to agency expertise is especially warranted for scientific matters).

Here, the statutory authority and applicable standard to which APHIS must adhere is expressly set forth in 7 U.S.C. § 7701. "The rule that, where the statute contains no ambiguity, it must be taken literally and given effect according to its language, is a sound one not to be put aside to avoid hardships that may sometimes result from giving effect to the legislative purpose." *Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002, 1007 (1971). *See also, Commr. of Immigration v. Gottlieb,* 265 U.S. 310, 313, 44 S.Ct. 528, 68 L.Ed. 1031 (1924).

APHIS has reasonably interpreted its responsibilities under 7 U.S.C. § 7711(b) to "ensure that the processes used in developing regulations" for fruit imports that will prevent the introduction of Medfly into the United States are "based on sound science and are transparent and accessible." The express standard Congress set forth in 7 U.S.C. § 7701, regarding the Secretary's execution of her duties under the PPA requires only that the Secretary "facilitate exports, imports, and interstate commerce in agricultural products and other commodities that pose a risk of harboring plant pests or noxious weeds in ways that will reduce, *to the extent practicable, as determined by the Secretary,* the risk of dissemination of plant pests or noxious weeds," and "decisions affecting imports, exports, and interstate movement of products regulated under this title shall be based on sound science." 7 U.S.C. § 7701(3) and (4). To read a numeric threshold risk requirement into the statute

would require the court to disregard common principles of statutory construction,[31] and would abrogate the PPA's clear grant of discretion to the Secretary to reduce risks of plant pests and noxious weeds "to the extent practicable." As discussed below Plaintiffs have provided no scientific reason to disregard the Secretary's analyses, interpretations, and scientific judgments used to establish the Rule. 7 U.S.C. § 7701(3).

The Secretary conducted tests and analyses to conclude the likelihood of a mated Medfly pair "reaching suitable host material," as opposed to establishing a Medfly population, was so rare as to be unlikely to occur with a probability of less than once every 2,000 years, adopting the most conservative probability. Based on all the control measures prescribed by the Rule, the Secretary reasonably concluded that the Rule's protections "reduced to the extent practicable" the risk of Medfly introduction. Judicial deference to the Rule is justified on the totality of the record. *Environmental Defense Center, Inc. v. United States Environmental Protection Agency,* 344 F.3d 832, 858 fn. 36 (citing *Washington v. Daley,* 173 F.3d 1158, 1169 (9th Cir.1999)).

### vi. *Plaintiffs' Lack of Experts*

Plaintiffs have not provided any expert evidence or persuasive scientific analysis to explain or contradict the Agency's science that appears in the A.R., nor that calls into questions the accuracy of the Secretary's conclusions. To support their position that the science underlying the October 15th Final Rule is faulty and/or insufficient to support the Rule, Plaintiffs' counsel picks at the APHIS team's expert

---

**31.** "Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement." *See TVA v. Hill,* 437 U.S. 153, 194–195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). *Accord, Badaracco v. C.I.R.,* 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984).

studies and commentary and criticizes its interpretation of the data as applied in the Rule. *See, e.g.,* Doc. 24 at p. 21 (citing A.R. at 1481) and pp. 22–38.

Plaintiffs' criticism of the legitimacy of APHIS's proposed methods is based on abandoned, inadequate measures in effect during the Medfly outbreak in 2001. They complain APHIS scientists were unable to definitively conclude the precise source of the outbreak. APHIS scientists' studies reasonably concluded that the probable source of the 2001 Medfly larvae importation resulted from the combination of an anomalous growth in Spain's Medfly population, exacerbated by: atypically warm weather and a longer growing season; inadequacy and variability of cold treatment measures; insufficient grower phytosanitary practices; and inadequate destination point testing. A.R. 989, 1072, 1283, 1395, and 1789. *See also,* 67 Fed.Reg. at 64703. After a thorough investigation, APHIS determined that the Final Rule adequately addresses each of the potential causes of the 2001 outbreak. "We believe the system we have designed addresses all possible explanations for the problem." A.R. 1283; 67 Fed.Reg. at 64703.

The uncontradicted weight of the data shows that in 23 extensive trials, 3 of 985, 322 Medfly larvae survived cold treatment of 34 to 36 degrees Fahrenheit over 14–18 days. The agency's conclusion that the final cold treatment schedule will achieve probit 9 mortality is justified by the record of testing. Had Plaintiffs provided expert evidence to challenge the validity of the scientific studies or the general scientific framework of the administrative record, the court could evaluate Plaintiffs' argument that either the science, or the agency's application of it, is somehow inaccurate, insufficient or unreliable. Instead, Plaintiffs' challenge to the science underlying the Rule and the conclusions the Agen-

cy reached, is no more than unfounded lay opinion of what other experts should or would have done or concluded. This is a failure of proof. It is reasonable to draw the evidentiary inference that Plaintiffs did not provide expert testimony because it would have been adverse. *United States v. Tory,* 52 F.3d 207, 211 (9th Cir.1995).

Plaintiffs' suggestion there is a need for further study of lower temperature-short duration treatments is unavailing, because the Rule no longer permits low temperature-short duration treatments. Even if, *arguendo,* further study is desirable, the agency's judgment that the existing data is sufficient to support probit 9 level of security, 67 Fed.Reg. at 64708, is reasonable and entitled to deference.

Even if Plaintiffs provided expert evidence to challenge the scientific basis for the Rule which contradicted the Agency's experts, in a "battle of the experts," judicial deference must be accorded the agency's experts unless their opinions are unsupported or wrong. *See, e.g., Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.,* 113 F.3d 1505, 1511 (9th Cir.1997); *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992); *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir. 1987). Plaintiffs have no evidence to show the agency's experts' opinions are unsupported or wrong. APHIS has broad discretion to select data and its method of calculation. *B.P. Exploration & Oil, Inc. (93–3310) v. U.S.E.P.A.,* 66 F.3d 784, 804 (6th Cir.1995). An agency's discretion is especially broad when it involves highly scientific or technical considerations. *Id.* at 804, citing *Reynolds Metals Co. v. U.S. Environmental Protection Agency,* 760 F.2d 549, 565 (4th Cir.1985).

## D. *THE FINAL RULE COMPLIED WITH EXISTING LAW*

"The final inquiry [on judicial review of agency action] is whether the Secretary's action followed the necessary procedural requirements." *Overton Park,* 401 U.S. at 417, 91 S.Ct. 814. Here, Plaintiffs allege that APHIS did not follow procedures required by the Regulatory Flexibility Act (RFA),[32] the Plant Protection Act (PPA),[33] and the National Environmental Policy Act (NEPA).[34]

### 1. *THE RULE DOES NOT VIOLATE PROCEDURES REQUIRED UNDER THE REGULATORY FLEXIBILITY ACT*

The Regulatory Flexibility Act (RFA) requires an agency to undertake a cost-efficiency analysis, to identify the most cost-efficient method of attaining the agency's statutory objectives and requires the agency to review the proposed rule's effect on small businesses. *See* 5 U.S.C. §§ 601, *et seq.* Before 1996 amendments to the RFA, unless an agency's noncompliance with the RFA was so unreasonable as to be arbitrary and capricious, judicial review of agency compliance with the RFA was generally not available. *See, e.g., State of Michigan v. Thomas,* 805 F.2d 176, 188 (6th Cir.1986); *Thompson v. Clark,* 741 F.2d 401, 405 (D.C.Cir.1984); *Small Refiner Lead Phase–Down Task Force v. U.S. EPA,* 705 F.2d 506, 539 (D.C.Cir.1983).

While the Office of Advocacy is charged with the primary responsibility of monitoring agency compliance with the RFA,[35] due to growing concerns over agency compliance, Congress passed the Small Business Regulatory Enforcement Fairness Act (SBREFA) in the Spring of 1996 which amended 5 U.S.C. § 611(a)(1) to provide an aggrieved party judicial review of agency compliance with sections 601, 604,[36] 605(b), 607, 608(b), 609(a) and 610 of the RFA. *See* Pub.L. 104–121, § 242.

When an agency promulgates a final rule under 5 U.S.C. § 553, the RFA, 5 U.S.C. § 604, directs the agency to prepare a final regulatory flexibility analysis that contains:

(1) a succinct statement of the need for, and objectives of, the rule;

(2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(5) a description of the steps the agency has taken to minimize the significant economic impact on small entities

---

**32.** *See* Doc. 1, Complaint at 8, filed October 16, 2002; Doc. 24 at 38.

**33.** See Doc. 1 at 7.

**34.** *See* Doc. 1 at 9.

**35.** See 5 U.S.C. § 612.

**36.** The amended statute provides that "sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604." 5 U.S.C. § 611(a)(1).

consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(1)-(5).

Courts have interpreted the RFA to require nothing more than a good faith effort to assess the impact of a regulation on small businesses. *See, e.g. U.S. Cellular Corp. v. F.C.C.*, 254 F.3d 78, 88 (D.C.Cir. 2001); *Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 624–25 (5th Cir.2000); *Ashley County Medical Center v. Thompson*, 205 F.Supp.2d 1026, 1066–67 (E.D.Ark.2002); *Hall v. Evans*, 165 F.Supp.2d 114, 145 (D.R.I.2001).

The filing of a regulatory flexibility statement under 5 U.S.C. § 604 is not required where an agency certifies that a rule will not have a significant impact upon a substantial number of small entities. *See* 5 U.S.C. § 605(b). Such a certification must be made by the head of the agency and the agency is required to publish that certification in the Federal Register at the time of publication "along with a statement providing the factual basis for such certification." *Id.*

■ The agency's 5 U.S.C. § 605(b) certification that "the regulations will likely not have a significant economic impact on a substantial number of small entities of Medfly host crop producers in the United States," or on "small entities," is found at A.R. 1317, 67 Fed.Reg. 64737–38. This certification is supported by an analytical statement:

1) There are approximately 15 Spanish clementine importers in the United States, three of which provide the majority of clementine importation;

2) Individuals in foreign countries own at least two of the import companies in "this list;"

3) The SBA deems small entities as fresh fruit and vegetable wholesalers with 100 employees or less;

4) Small wholesalers include wholesalers and grocery stores with annual sales of $23 million or less;

5) Small wholesalers include warehouse clubs and superstores with annual sales of $23 million or less;

6) Small wholesalers include fruit and vegetable markets with annual sales of $6 million or less;

7) The percentage of income derived from the sale of clementines by wholesalers is "likely to be low" so that these regulations will not have a significant negative impact on small wholesalers; and

8) Small importers and wholesalers will likely be "better off" under the proposed regulations when compared to their status under the current ban on importation of clementines altogether as well as compared to the less strict conditions imposed prior to that ban.

The agency's statement in support of its 5 U.S.C. § 605(b) certification recognizes: "We do not know whether the majority of producers of Medfly host crops to the U.S. are designated as small entities;" and "the number of small wholesalers potentially affected by the regulations is not known." A.R. 1265.

However, the Agency concludes that regulatory costs on producers of Medfly host crops will more than likely not be significant because "Medfly introduction costs are low under the regulations, regardless

of Medfly pest pressure and field control in Spain." As to the 15 clementine importers in the United States, three of which import the majority of the fruit, it is unclear whether such importers are "small entities," (fruit and vegetable wholesalers with 100 employees or less).

The number of small wholesalers potentially affected by the regulations is not known. Small wholesalers include wholesalers and other grocery stores with annual sales receipts of $23 million or less; warehouse clubs and superstores with annual sales receipts of $23 million or less; and fruit and vegetable markets with annual sales receipts of $6 million or less. Overall, the percentage of income derived from the sale of Clementines by all U.S. wholesalers is likely to be low, preventing the regulations from having significant negative impact relative to either baseline. Small importers and wholesalers are likely to be better off under regulations where they will have product to sell and better off than under the previous program, due to increased controls. A.R. 1237.

Import levels are projected to increase with the average of 2.5 days of additional cold treatment. Expenditures borne by Spanish exporters (the recall amount was 1.42% of average export value during 1999 and 2000) will likely not lead to significant price increases even if it is assumed all the additional cost is borne by U.S. importers. Due to inelasticity of demand in historical European markets, it is unlikely that extra cold treatment will increase exports to non-U.S. markets and increased U.S. exports will be reduced by higher levels of diversion of clementines in peak Medfly season under increased controls, which should reduce U.S. imports, increase import prices and reduce regulatory gains for small U.S. importers over the prior import program. In the initial season, due to lower level imports, it is not expected that

importers and wholesalers will realize regulatory gains equal to the previous import program due to reduced volume.

The agency's statement that small importers and wholesalers will likely be "better off" under the proposed regulations when compared to their status under a total ban on importation of clementines or compared to the less stringent conditions that prevailed prior to the ban, is based on import increases over time without increase in regulatory costs to importers. A.R. 1236–38, 1317.

The agency prediction that the "import levels will more than likely increase under the regulations," is obvious because any imports will be an increase over no imports. The agency opines that "clementine imports will more than likely be lower during the first shipping season...," A.R. 1318, due to increased regulation. This follows as the program measures are put into effect in Spain and the United States, there will be fewer qualifying clementines that will satisfy import criteria. To the extent other foreign markets have less stringent import controls, Spanish producers may divert product to such market. The agency relies on other analyses supporting its overall conclusion that the rule itself will result in a sufficiently high probability that Medfly infestation will not occur to conclude that any impact the new rule will have on small entities, will be positive rather than negative, negating the need for a regulatory flexibility analysis. See Doc. 32 at 48–52. This argument is not without merit.

Following the events of 2001, Plaintiffs have not provided any analysis that a consumer actually found a live Medfly larva, or that the worst case 1.5% hypothetical Risk Management Analysis (RMA) infestation rate actually was experienced in the 2002 import season. Arguing post-record issues invites consideration of the 2002–03

season data. Plaintiffs have not shown with scientific evidence that their assumed value of 7 rather than 3 surviving larvae makes any difference as to the values selected for the RMA.

Plaintiffs suggest the Risk Management Analysis has discrepancies from the Regulatory Impact Analysis (RIA). Both the RMA, A.R. 1225–1280, and the RIA provide a realistic analysis of the costs and benefits of importing clementines. The RMA utilizes a risk minimization review based on conservative values to assess risk. The RIA looks at a worst-case analysis to measure costs and benefits. Given the minimal to non-existent risk of Medfly presence from imported clementines in the United States, Plaintiffs' predicted 1.5 billion dollar catastrophe is hyperbole, premised on a no-action hypothesis. No such catastrophe occurred in 2001 in an actual Medfly "outbreak." There is no indication Interior would not act immediately if presented with a new "outbreak." The cost of the successful 2001 Medfly eradication programs was about 14 million dollars. No other potential harm or cost to Plaintiffs is suggested; except the risk of competition, a risk Plaintiffs have accommodated through the years clementines have been imported.

2. *THE RULE DOES NOT VIOLATE PROCEDURES REQUIRED UNDER THE PLANT PROTECTION ACT*

 The Plant Protection Act (PPA) was enacted in 2000 to provide agricultu-

rists with regulatory protection from "plant pests" or "noxious weeds" whose importation posed risks of devastating consequences for domestic agriculture. 7 U.S.C. §§ 7712 to 7716. Under the Act, the Secretary of Agriculture may restrict importation or interstate movement of any plant or plant product, including citrus fruit, to prevent the introduction of harmful pests or weeds which could harm domestic agriculture. 7 U.S.C. § 7712(a) and (c). In order to carry out this policy, the PPA authorizes the Secretary of Agriculture to issue regulations,[37] order the destruction or quarantine of harmful organisms,[38] create an integrated management plan for any geographical area or ecological range in the country,[39] and/or, without a warrant, stop and inspect any person or means of conveyance of importation into the country or in interstate commerce to determine whether the person or conveyance is carrying any plant, pest, or noxious weed and, with a warrant, to enter any premises and investigate for plant pests or noxious weeds.[40]

The PPA provides the Secretary with meaningful enforcement measures and wide discretion to effectuate its policies. Title 7 § 7711(b) specifies the only PPA procedure with which the agency is expressly required to comply: "[t]he Secretary shall ensure that the processes used in developing regulations under subsection (a)[41] of this section governing consider-

**37.** *See* 7 U.S.C. § 7712.

**38.** *See* 7 U.S.C. § 7714(a) and (b).

**39.** *See* 7 U.S.C. § 7714(c).

**40.** See 7 U.S.C. § 7731 (probable cause required).

**41.** 7 U.S.C. § 7711(a) prohibits plant pests from being imported/exported or otherwise

moved through interstate commerce unless accompanied by a permit and in accordance with the Secretary's regulations under this title: "Except as provided in subsection (c) of this section, no person shall import, enter, export, or move in interstate commerce any plant pest, unless the importation, entry, exportation, or movement is authorized under general or specific permit and is in accordance with such regulation as the Secretary may issue to prevent the introduction of plant

ation of import requests are based on sound science and are transparent and accessible." Title 7 U.S.C. § 7712(b) provides, "[t]he Secretary shall ensure that processes used in developing regulations under this section governing consideration of import requests are based on sound science and are transparent and accessible." By conducting various scientific studies [42] and analyses [43] which the agency expressly relied upon, analyzed, and discussed in reaching its conclusion,[44] the Secretary has complied with the existing procedural law required by the PPA. The agency has "discretion to rely on the reasonable opinions of its own qualified experts." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Plaintiffs had the burden of producing evidence or by identifying evidence in the A.R. that

shows the science employed was not sound. They have not done so. The agency's decisions that the Rule is effective to control risk and that its protections reasonably reduce the likelihood of a mated pair of Medflies in the U.S. in fruit from Spain present in suitable habitat, to less than one in two thousand years, considering the 95th percentile of distribution, are not arbitrary, capricious, or contrary to law. A.R. at 1394.

3. *THE RULE DOES NOT VIOLATE PROCEDURES REQUIRED UNDER THE NATIONAL ENVIRONMENTAL PROTECTION ACT*

Neither party has provided in-depth analysis of the NEPA claim. "The purpose of NEPA is 'to inject environmental considerations into the federal agency's de-

---

pests into the United States or the dissemination of plant pests within the United States."

42. *See, e.g.,* "Quantitative Analysis of Available Data on the Efficacy of Cold Treatment against Mediterranean Fruit Fly Larvae," July 5, 2002, at A.R. 1207–1224; "Fruit Fly Cooperative Control Program, Final Environmental Impact Statement" (2001), 67 Fed.Reg. 64727, A.R. 1307 (available at http://www.aphis.usda.gov/ppd/es/ppq/fffeis.pdf); De Lima, C.P.F., A. Jessup, and R. McLauchlan.2002. "Cold disinfestations of citrus using different temperatures X time combinations." *Horticulture Australia Ltd. Project Number: CT96020,* 67 Fed.Reg. 64708, A.R. 1288; Landolt, P., D. Chambers, and V. Chew.1984. "Alternative to the use of probit 9 mortality as a criterion for quarantine treatments of fruit fly (Diptera: Tephritidae)—infested fruit." *J. Econ. Entomol 77: 285–287,* 67 Fed.Reg. 64717, A.R. 1297; Synopsis of APHIS review of cold treatment records of ports of Philadelphia, PA and Elizabeth, NJ; Synopsis of APHIS study tracing initial interceptions in 2001 to be traced to particular vessels, "M/V Japan Senator" and "M/V Green Maloy," A.R. 1289.

43. *See, e.g.,* "Risk Mitigation Analysis" at A.R. 1392–1460 (notice and comment provided at 67 Fed.Reg. 18578–79, *and extended* at 67

Fed.Reg. 36560–61); "Office of Risk Assessment and Cost Benefit Analysis" ("ORACBA Analysis") at A.R. 1461–1479; "Regulatory Impact Analysis," A.R. 1320–91; Wearing, C.H., J. Hansen, C. Whyte, C.E. Miller, J. Brown.2001. "The potential for spread of codling moth (Lepidoptera: Tortricidae) via commercial sweet cherry fruit: a critical review and risk assessment." *Crop Protection 20: 465–488,* 67 Fed.Reg. 64717, A.R. 1297; Roberts, R.C. Hale, T. Van der Zwet, C.Miller, S. Redlin.1998. "The potential for spread of Erwinia amylovora and fire blight via commercial apple fruit; a critical review and risk assessment." *Crop. Prot. 19–28, Id.;* Whyte, C.F., R. Baker, J. Cowley, and D. Harte.1996. "Pest establishment, a quantitative method for calculating the probability of pest establishment form imported plants and plant products, as a part of pest risk assessment." *NZ Plant Protection Centre Publications, No. 4, ISSN 1173–6704. Lynfield, NZ., Id.;* Analyses of hypergeometric sampling rates and Confidence/percentage of infestation Chart at 67 Fed.Reg. 64712–13, A.R. 1292.

44. 67 Fed.Reg. 64702–64739, A.R. 2182–1319.

cision-making process' and 'to inform the public that an agency has considered environmental concerns in its decision-making process.'" *Forelaws on Board v. Johnson,* 743 F.2d 677, 686 (9th Cir.1984) citing *Catholic Action of Hawaii,* 454 U.S. at 143, 102 S.Ct. 197; see also 40 C.F.R. § 1502.1. "NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process." *See* 40 C.F.R. §§ 1501.2, 1502.5; *see also Methow Valley,* 490 U.S. at 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (explaining that NEPA 'ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts'). *Metcalf v. Daley,* 214 F.3d 1135, 1145 (9th Cir.2000).

The NEPA requires agencies to prepare a detailed Environmental Impact Statement (EIS) when the proposed legislation will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332. An EIS shall identify and set forth:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

 While in some instances, regulations for plant pest eradication by the De-

partment of Agriculture may require the preparation of an EIS,[45] APHIS has adequately demonstrated that the Rule does not pose a colorable risk of affecting the quality of health or the human environment. *See* "Office of Risk Assessment and Cost Benefit Analysis" ("ORACBA Analysis") at A.R. 1461–1479 and "Regulatory Impact Analysis," A.R. 1320–91.

Title 7 C.F.R. § 372.5 classifies those agency actions which normally require an EIS and those which do not. Agency actions which normally require an environmental assessment but not necessarily an EIS are those actions which:

> may involve the agency as a whole or an entire program, but generally is related to a more discrete program component and is characterized by its limited scope (particular sites, species, or activities) and potential effect (impacting relatively few environmental values or systems). Individuals and systems that may be affected can be identified.

7 C.F.R. § 372.5(b). The Final Rule impacts, most directly, U.S. citrus growers, importers to the U.S., and consumers who purchase Spanish clementines. The Defendants contend the Rule falls within that category of agency action which does not necessarily require an EIS as specified by 7 C.F.R. § 372.5, and that APHIS's election not to file an EIS was within the scope of its authority and in compliance with the NEPA, because the administrative record supports its assessment that the Final Rule will not "significantly affect[ ] the quality of the human environment," under 42 U.S.C. § 4332 as contemplated by 7 C.F.R. § 372.5. A.R. 1307.

The Secretary argues that neither an EIS, nor an Environmental Assessment (EA), is required here because the Rule

---

**45.** *Environmental Defense Fund v. Hardin,* 325 F.Supp. 1401 (D.D.C.1971); *Save Amer-* *ica's Vital Environment, Inc. (SAVE) v. Butz,* 347 F.Supp. 521 (N.D.Ga.1972).

falls under 7 C.F.R. § 372.5(c)'s categorical exclusions from any further environmental analysis. A.R. at 1307, 67 Fed. Reg. 64727. Title 7 C.F.R. § 372.5(c) categorically excludes agency action from the EIS or EA requirements where "the means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves." *Id.* The USDA has promulgated a non-exclusive list of categorical exclusions from the EIS and EA requirements which have been codified at 7 C.F.R. 1b.3(a),[46] and include research activities and studies, such as data collection, which are clearly limited in context and intensity.

Title 7 C.F.R. 372.5(c)(1) provides categorical exclusions from EIS or EA requirements for agency actions consisting of routine measures, "such as identifications, *inspections*, surveys, *sampling that does*

*not cause physical alteration of the environment, testing*, seizures, *quarantines*, removals, sanitizing, inoculations, *control*, and *monitoring employed by agency programs* to pursue their missions and functions." 7 C.F.R. § 372.5(c)(1)(i)(*emphasis added*).[47] Title 7 C.F.R. § 372.5(c)(2) provides categorical exclusions from EIS or EA requirements for agency actions consisting of research and development activities, "that are carried out in laboratories, facilities, or other areas designed to eliminate the potential for harmful environmental effects—internal or external—and to provide for lawful waste disposal." [48]

Title 7 C.F.R. § 372.5(c)(3) provides categorical exclusions from EIS or EA requirements for agency actions consisting of the following licensing, permitting, or authorization activities:

. . .

---

**46.** 7 C.F.R. § 1b.3(a) categorically excludes from the EA or EIS requirements the following agency activities:

 (1) Policy development, planning and implementation which relate to routine activities, such as personnel, organizational changes, or similar administrative functions;
(2) Activities which deal solely with the funding of programs, such as program budget proposals, disbursements, and transfer or reprogramming of funds;
(3) Inventories, *research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity;*
(4) Educational and informational programs and activities;
(5) Civil and criminal law enforcement and investigative activities;
(6) Activities which are advisory and consultative to other agencies and public and private entities, such as legal counseling and representation;
(7) Activities related to trade representation and market development activities abroad.
*Id. (emphasis added ).*

**47.** 7 C.F.R. § 372.5(c)(1)(ii) provides the following examples of "routine measures" categorically excluded from the EIS or EA requirement:
 (A) Inoculation or treatment of discrete herds of livestock or wildlife undertaken in contained areas (such as a barn or corral, a zoo, an exhibition, or an aviary);
 (B) Pesticide treatments applied to infested plants at a nursery; and
 (C) Isolated (for example, along a highway) weed control efforts.

**48.** 7 C.F.R. § 372.5(c)(2)(ii) provides the following examples of "research and development activities" categorically excluded from the EIS or EA requirement:
 (ii) Examples of this category of actions include:
 (A) The development and/or production (including formulation, repackaging, movement, and distribution) of previously approved and/or licensed program materials, devices, reagents, and biologics;
 (B) Research, testing, and development of animal repellents; and
 (C) Development and production of sterile insects.

(iii) Permitting of:

(A) Importation of nonindigenous species into containment facilities,

(B) Interstate movement of nonindigenous species between containment facilities, or

(C) Releases into a State's environment of pure cultures of organisms that are either native or are established introductions.

Title 7 C.F.R. § 372.5(c)(4) provides categorical exclusions from EIS or EA requirements for agency actions consisting of the "[r]ehabilitation of existing laboratories and other APHIS facilities, functional replacement of parts and equipment, and minor additions to such existing APHIS facilities."

The Secretary argues that it is excluded from providing an EIS or EA here because:

the means through which adverse environmental impacts are avoided has been built into the rule itself...[by][ ] design[ating] a regulatory approach that results in a very low probability that a mated pair of Medflies could enter the United States via imported Spanish clementines...[and where] [t]he only adverse environmental impacts that could be associated with the importation of Spanish clementines relate to the potential introduction of a pest via that commodity...

A.R. at 1307, 67 Fed.Reg. 64727.

Substantial deference must be accorded an agency's interpretation of the meaning of its own categorical exclusions from the NEPA's EIS and EA requirements unless it is plainly erroneous. *See Alaska Center for the Environment v. U.S. Forest Service,* 189 F.3d 851, 857 (9th Cir.1999) (cit-

ing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) and *United States v. McKittrick,* 142 F.3d 1170, 1173 (9th Cir. 1998)). Moreover:

An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious.

*Bicycle Trails Council v. Babbitt,* 82 F.3d 1445, 1456, fn. 5 (9th Cir.1996). *Accord, Committee for Idaho's High Desert v. Collinge,* 148 F.Supp.2d 1097 (D.Idaho 2001).

*Collinge* considered the Wildlife Service's predator control program aimed at protecting an endangered bird, the sage grouse, which entailed the killing and trapping of predators such as black bears, mountain lions, bobcats, raccoons, magpies, ravens, foxes, coyotes, badgers and skunks, via poisonous eggs, leghold traps, snares, denning, calling and shooting, and aerial hunting. 148 F.Supp.2d at 1100. The *Collinge* plaintiffs sought to enjoin the Wildlife Service from executing its predator control program on the basis that its environmental assessments (EA) were insufficient and outdated and because an environmental impact statement (EIS) had not been prepared in violation of NEPA. *Id.* The Wildlife Service's response that its predator control program was categorically excluded from the EIS or EA requirements of the NEPA under 7 C.F.R. § 372.5(c)(2), was rejected for failure to specifically demonstrate how the asserted exclusions applied to the program. *Id.* at 1102. The Wildlife Service's "general statement [that the program was categorically excluded] says nothing about whether the particular predation control proposal at issue here falls within the specific terms

of a categorical exclusion established by regulation." *Id.*

*California v. Norton,* 311 F.3d 1162, 1176 (9th Cir.2002) rejected Interior's argument that it was entitled to a categorical exclusion from the NEPA's EIS and/or EA requirements because it failed to provide "contemporaneous documentation" to show that the agency considered the environmental consequences of its action. *Id.* "Post hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made." *Id.* (citing *Collinge, supra,* at 1103).

Here, by contrast, the nature and purpose of the Rule itself, aimed at the prevention of Medfly introduction into the United States, is designed to protect human health and the environment. Its risk analyses adequately address all issues of environmental concern, particularly the threat of the spread of Medflies, the risk to plant life (crops), and the risk to consumers who could encounter larvae in a fruit. Any additional study as to the environmental impact of Medfly introduction would be repetitive of the agency's 2001 Environmental Assessment and resulting statement.

Plaintiffs have not shown that the Secretary's assertion of categorical exclusions, supported by substantial record evidence, requires the Secretary's further explanation under NEPA or what such an explanation would address. *See Norton,* 311 F.3d at 1177. The Rule itself is aimed at effectively preventing Medfly importation into the United States, to protect human health and the environment. The Rule's corrective measures do not pose new environmental hazards (such as the application of new or untested pesticides post-entry);

rather, the environmental impact of the Rule itself is salutary. Phytosanitary practices are to be implemented in Spain; cold storage will be supplied in Spain, in transit, and in the U.S.; sampling and testing of fruit will be conducted at all stages from production in the field, through import and ultimate delivery to the consumer.

The "hard look" analysis required by the NEPA is unnecessary and inapplicable because the Rule's design and its overall purpose is protection of the environment and human health. Even assuming a "hard look" must be taken, the Secretary has done so. The agency correctly relies on applicable categorical exclusions from the NEPA's EIS and EA requirements. Plaintiffs have provided no factual evidence or law to show the inapplicability of the exclusions or the applicability of any exceptions to the exclusions. The Secretary's interpretation of the categorical exclusions has not been challenged in any meaningful substantive way. Deference must be accorded to the Secretary's NEPA findings.

## V. CONCLUSION

For all the reasons stated above, IT IS ORDERED:

1. Federal Defendants' request for judicial notice of the existence and authenticity of the 2002–2003 Data Report as being created and published by the Department of Agriculture is GRANTED;

2. Federal Defendants' request for judicial notice of the accuracy and validity of the contents of the 2002–2003 Data report is DENIED, however, judicial notice is taken that the data was assembled, analysis performed, and no Medfly detections were made;

 

3. Intervenor Defendants' request for judicial notice of the authenticity and existence of the Department's Stakeholder Letter is GRANTED;

4. Intervenor Defendants' request for judicial notice of the veracity and/or accuracy of any of the statements, disputed facts, or conclusions of fact contained in the Stakeholder Letter is DENIED;

5. The Department's October 15th Final Rule providing for importation of clementines from Spain to resume, subject to revised conditions and additional preventative measures, is reasonably supported by the administrative record, adequately justified through the agency's transparent application of sound science, within the scope of the agency's authority under the PPA, and in full compliance with existing law.

6. Defendants' motion for summary judgment is GRANTED; and

7. Defendants shall submit a form of judgment in conformity with this decision within the next five (5) days following service of this decision by the Clerk.

SO ORDERED.